[Crim. No. 6786. In Bank. Nov. 2, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. ALBERT
ERNEST LOVE, Defendant and Appellant.

Carl B. Shapiro, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk, Attorney General, Doris H. Maier, Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Plaintiff and Respondent.

TRAYNOR, J.—For the third time a jury has fixed defendant's penalty at death for the murder of his wife. He was first tried in 1958. The jury found him guilty but could not agree on the penalty. A second jury fixed the penalty at death; but the trial court granted a new trial on the ground of newly discovered evidence, and we affirmed. (*People* v. *Love*, 51 Cal.2d 751 [336 P.2d 169].) Defendant was again tried in 1959 and found guilty of murder in the first degree; again the jury fixed the penalty at death. We affirmed the judgment as to the adjudication that defendant is guilty of murder of the first degree and was sane at the time of the commission of the offense. We reversed the judgment as to the imposition of the death penalty because of the admission of evidence tending to inflame and prejudice the jury. (*People* v. *Love*, 53 Cal.2d 843 [350 P.2d 705].)

Upon retrial of the issue of penalty, defendant discharged his attorneys and conducted his own defense. The court cautioned him not to waive counsel; but defendant insisted on defending himself. The jury again fixed the penalty at death. This appeal from the judgment entered on the jury verdict is automatic. (Pen. Code, § 1239, subd. (b).)

Defendant contends that the trial court denied him due process by permitting the prosecutor to open and close the penalty trial and the argument to the jury. This procedure was expressly approved in *People* v. *Corwin*, 52 Cal.2d 404, 407 [340 P.2d 626]. That case governs here, even though a new jury was selected to consider the penalty. (*People* v. *Gonzalez, ante*, pp. 317, 319 [14 Cal.Rptr. 639, 363 P.2d 871].)

Defendant cannot reopen the question of his sanity at the time of the commission of the offense, for the judgment on the issue of insanity was affirmed in *People* v. *Love, supra*, 53 Cal.2d 843, 858.

The court did not err in dismissing defendant's subpoena for Governor Brown and Warden Duffy. Defendant voluntarily dismissed the subpoena for Warden Duffy. He had subpoenaed Governor Brown to elicit his views on capital punishment. The penalties for first degree murder have been fixed by the Legislature. (Pen. Code, § 190.) The wisdom or deterrent effect of those penalties are for the Legislature

to determine and are therefore not justiciable issues. Hence evidence as to these matters is inadmissible. Juries in capital cases cannot become legislatures *ad hoc,* and trials on the issue of penalty cannot be converted into legislative hearings.

 The court did not err in denying a change of venue. An application for change of venue is addressed to the sound discretion of the trial court. (*People* v. *Burwell,* 44 Cal.2d 16, 30 [279 P.2d 744].) There has been no showing of abuse of discretion. The court did not err in excusing prospective jurors conscientiously opposed to capital punishment. (*People* v. *Riser,* 47 Cal.2d 566, 575-576 [305 P.2d 1].) During the selection of the jury both sides "passed" the jury as presently constituted. Thereafter, both the prosecutor and the defendant continued to exercise peremptory challenges. There was no objection to their doing so, and defendant could not have been prejudiced thereby.

 Defendant objects to the introduction of two colored photographs of the victim. In *People* v. *Love, supra,* 53 Cal.2d at pages 852-853, we stated "[t]he photographs in the present case were not exceptionally gruesome. . . . The photographs tend to prove how the shooting occurred and corroborate evidence that defendant intentionally held the gun close to his wife's body to avoid injuring others." These facts are relevant to punishment as well as to guilt. (*People* v. *Jones,* 52 Cal.2d 636, 647 [343 P.2d 577].)

Defendant contends that the court erroneously admitted evidence and erroneously instructed the jury on the average time between conviction and parole of prisoners serving a life sentence for first degree murder. He insists that parole of prisoners differs from case to case and that statistics on this subject are misleading.

 Evidence of the minimum, average and maximum terms actually being served by persons convicted of first degree murder is admissible. (*People* v. *Purvis,* 52 Cal.2d 871, 884-885 [346 P.2d 22].) Moreover, defendant elicited all relevant testimony on the factors that influence parole and that would be considered by the Adult Authority in his case before granting him a parole. The trial court instructed the jury on the minimum period of imprisonment before defendant would be eligible for parole. It also instructed the jury that the actual period of parole depends on a number of factors including his criminal record and his behavior in prison. The court then reviewed the evidence on the mean

and median times between conviction and parole served by prisoners sentenced to life imprisonment for first degree murder. In *People* v. *Reese,* 47 Cal.2d 112, 116-117 [301 P.2d 582], we held that a jury may be instructed on the minimum time that must be served before a prisoner will be eligible for parole; the instructions in the present case were more favorable to defendant.

Defendant contends that the trial court did not give proper consideration to his motion to reduce the penalty from death to life imprisonment.

After the jurors returned their verdict the court granted defendant a continuance to prepare his motion for a new trial. He then obtained counsel who presented the motion. They urged the court to reduce the penalty to life imprisonment on the ground that the evidence did not justify a sentence of death. The court ruled that it did not have the power to reduce the penalty and could grant a new trial only for errors of law.

Defendant's counsel, invoking *People* v. *Moore,* 53 Cal.2d 451, 454 [348 P.2d 584], insisted that the court had the power to reduce the penalty, but the court disagreed, stating: "Well, it's [the *Moore* case] a little different, apparently, apparently the remanding of the particular case was not as unlimited, not as limited as the remanding [of] this case." The following exchange between court and counsel ensued:

"Mr. Shapiro: No, because the same issue is at stake, isn't it, the only issue."

"The Court: Well, the conditions of the exercise of any discretion are predicated upon either an error of law, or a right on the part of the Court to recommend to the jury the sentence to be imposed, being vested by statute and I don't find that anywhere in the Penal Code under present procedure affecting penalty trials in murder.

"Mr. Shapiro: At the time of remanding this case, after the remand order remanding it in the *Moore* case, this court, the court in the *Moore* case was exactly in the same position as the Court is today, I believe.

"The Court: It is rather hard to rationalize, but——

"Mr. Shapiro: Beg pardon?

"The Court: The decision would be there, however, in view of the fact that three juries have exercised their conscientious judgment in this regard, I can't say that the death penalty was improper in this case. The motion for a new trial will be denied."

In *People* v. *Moore, supra,* 53 Cal.2d 451, 454, we declared:

"Although the jury in a jury trial has the exclusive power in the first instance to select the penalty for first degree murder as between death and life imprisonment [citations], this does not affect the power of a trial court, in disposing of a defendant's motion for a new trial, to reduce the punishment from death to life imprisonment. Based upon *its own independent view of the evidence,* the trial court is not only empowered to reduce the degree or class of the offense [citations], but is also empowered to reduce the penalty imposed." (Italics added.)

The power of the trial court to review the evidence and to reduce the penalty fixed by the jury is therefore settled. It is also settled that " '. . . This court cannot substitute its judgment as to choice of punishment [citation] even where we may doubt the appropriateness of the death penalty [citations].'. . . Only the trial court has the power to reduce the punishment originally selected by the trier of fact. . . ." (*People* v. *Rittger,* 54 Cal.2d 720, 734 [355 P.2d 645].)

Thus, the trial court has not only the power to reduce the penalty but the duty to review the evidence and to determine whether in its judgment the weight of the evidence supports the jury's verdict. (*People* v. *Borchers,* 50 Cal.2d 321, 328, 330 [325 P.2d 97].) In performing that duty the trial court must " '. . . judge the credibility of the witnesses, determine the probative force of the testimony and weigh the evidence. . . .' " (*People* v. *Sheran,* 49 Cal.2d 101, 109 [315 P.2d 5].)

It is clear from the record in this case that the trial court not only erred as to the scope of its power to reduce the penalty but also failed to give defendant's motion the consideration required by *People* v. *Moore,* and *People* v. *Sheran.* During most of the discussion of the motion the court was of the opinion that it did not have the power to reduce the penalty. At the time of the ruling on the motion, the court still doubted that it had such power and indicated that even if it had it would not exercise that power because three juries had fixed the penalty at death.

The trial court erred in giving weight to the jury verdict that had been set aside on the grounds of newly discovered evidence and to the jury verdict that had been set aside because of the admission of prejudicial evidence.

Although the court could properly consider the verdict of the jury in the present case, it could not rely on that verdict alone and thus shift its own responsibility to the jury. It had an independent responsibility to give defendant and the People the benefit of its own judgment as to whether or not the death penalty was proper.

If the only error was the failure of the trial court properly to consider defendant's motion for a new trial, it would be appropriate to vacate the judgment and order denying the motion for new trial with directions to the trial court to reconsider the motion and to enter the appropriate judgment or order. (See *People* v. *Moore, supra,* 53 Cal.2d 451, 452.) Since it appears, however, that the prosecutor committed prejudicial misconduct in arguing the deterrent effect of the death penalty to the jury, the judgment and the order denying the motion for new trial must be reversed.[1]

During closing arguments the prosecutor urged the jury to fix the penalty at death because such penalty would serve as a deterrent to others. The prosecutor also stated: "It is a known fact that callous, hardened criminals when they commit burglaries, robberies, breakins, rarely carry loads in their pistols. . . . [W]hen men are asked after these crimes are committed, . . . 'you don't keep any loads in your gun when you were arrested. Why is that?' Do you know *that* these people say? Members of the jury, they say they know that the law says that if they kill someone while they are in that robbery, or that burglary, that they will get the death penalty, and therefore thinking and reflecting on that, even while they commit their crimes, they unload their guns and as insurance against not getting the death penalty. . . . In other words if there were no death penalty, if jurors did not exercise their sound discretion in a proper case such as this and inflict it

---

[1]There is no merit in defendant's contentions that the prosecutor also committed prejudicial misconduct by reserving psychiatric testimony for rebuttal that should have been offered, if at all, in the case in chief and by stating during the *voir dire* and in his argument that he represented the People of the State of California.

The psychiatric testimony was offered to rebut testimony by a defense witness that defendant was incapable of premeditation. The issue of defendant's capacity to premeditate was not part of the prosecutor's case in chief in the trial on the penalty. It was proper rebuttal, and the trial court did not abuse its discretion in admitting the testimony. Pen. Code, § 1093, subd. 4; *People* v. *Carter,* 48 Cal.2d 737, 753-754 [312 P.2d 665].) Moreover, defendant did not object to its admission.

The prosecutor's statements that he represents the People of California were not improper. (*People* v. *Wein,* 50 Cal.2d 383, 395 [326 P.2d 457].)

and have the courage to inflict it, it would be better for a burglar or murderer or someone committing a crime to take a chance and kill someone. . . . [T]hey would know then that they could gamble ten to twelve years against shooting someone to escape and silencing the witness, killing the policeman, killing the clerk and getting away, but they know their life is, paltry as they are, it keeps them in line, and gives them the fear in their hearts that they are not going to murder innocent people, not because they don't want to, but for plain good business that they might gamble ten to twelve years life imprisonment on a parole to shoot someone to kill someone, but they won't gamble their own life.''

 Counsel's summation to the jury "must be based solely upon those matters of fact of which evidence has already been introduced or of which no evidence need ever be introduced because of their notoriety as judicially noticed facts.'' (6 Wigmore, Evidence (3d ed. 1940) § 1806, p. 269; accord *People* v. *Evans*, 39 Cal.2d 242, 251 [246 P.2d 636].) He may state matters not in evidence that are common knowledge, or are illustrations drawn from common experience, history, or literature. (*People* v. *Gingell*, 211 Cal. 532, 541-542 [296 P. 70] ; *People* v. *Molina*, 126 Cal. 505, 508 [59 P. 34] ; *People* v. *Scarborough*, 171 Cal.App.2d 186, 190 [340 P.2d 76] ; *People* v. *Travis*, 129 Cal.App.2d 29, 37-39 [276 P.2d 193] ; Levin and Levy, *Persuading the Jury*, 105 U.Pa.L.Rev. 139, 150; 1 Thompson, Trials, 814-817, 831.) He may not, however, under the guise of argument, assert as facts matters not in evidence or excluded because inadmissible. (*People* v. *Kirkes*, 39 Cal.2d 719, 724 [249 P.2d 1] ; *People* v. *Evans*, *supra*, 39 Cal.2d 242, 251; *People* v. *Carr*, 163 Cal.App.2d 568, 577 [329 P.2d 746] ; *People* v. *Whitehead*, 148 Cal.App.2d 701, 705-706 [307 P.2d 442] ; *People* v. *Vienne*, 142 Cal.App.2d 172, 173-174 [297 P.2d 1027] ; *People* v. *Talle*, 111 Cal.App.2d 650, 675 [245 P.2d 633] ; see 6 Wigmore, Evidence (3d ed. 1940) § 1807, p. 261.) He may not use evidence offered for a special purpose, such as credibility or state of mind, to argue inferences for which the evidence is inadmissible (*People* v. *Purvis*, *ante*, pp. 93, 99 [13 Cal.Rptr. 801, 362 P.2d 713] ; *People* v. *Adams*, 182 Cal.App.2d 27, 38 [5 Cal.Rptr. 795] ; *People* v. *Talle*, *supra*, 111 Cal.App.2d 650, 675; see 6 Wigmore, Evidence (3d ed. 1940) § 1807, p. 272), and he may not argue his own belief of guilt based upon evidence not produced in court. (*People* v. *Kirkes*, *supra*, 39 Cal.2d 719, 724; *People* v. *Edgar*, 34 Cal.App. 459, 468 [167 P. 891] ;

see 6 Wigmore, Evidence (3d ed. 1940) § 1806, p. 259; Stout, *Appellate Review of Criminal Convictions on Appeal,* 43 Cal. L.Rev. 381, 427.) ▮▮▮ Moreover, counsel may not use arguments calculated to mislead the jury (*People* v. *Purvis,* 52 Cal.2d 871, 886 [346 P.2d 22]; *People* v. *Caetano,* 29 Cal. 2d 616, 619-620 [177 P.2d 1]; *People* v. *Johnson,* 178 Cal.App. 2d 360, 372 [3 Cal.Rptr. 28]; *Affett* v. *Milwaukee & Suburban Transport Co.,* 11 Wis.2d 604 [106 N.W.2d 274, 280]; see Michael and Adler, *Trial of an Issue of Fact,* 34 Colum.L.Rev. 1224, 1483-1484) or that appeal primarily to passion or prejudice. (*People* v. *Wein,* 50 Cal.2d 383, 397 [326 P.2d 457]; *People* v. *Simon,* 80 Cal.App. 675, 677-679 [252 P. 758]; see Levin and Levy, *Persuading the Jury,* 105 U.Pa.L.Rev. 139, 143; 54 Colum.L.Rev. 946, 949; 36 Colum.L.Rev. 931, 935.) ▮▮▮ Prosecutors have often stated that it is necessary swiftly and severely to punish the guilty, and such statements have usually been considered within the bounds of proper argument. (*People* v. *Friend,* 47 Cal.2d 749, 766 [306 P.2d 463]; *People* v. *Wilson,* 61 Cal.App. 611, 628 [215 P. 565]; *State* v. *Rhoden* (Mo.) 243 S.W.2d 75, 77; Johnson v. *State,* 141 Tex. Crim. Rep. 43 [147 S.W.2d 811, 814]; *Smith* v. *State,* 74 Ga.App. 777 [41 S.E.2d 541, 551]; *People* v. *Wood,* 318 Ill. 388 [149 N.E. 273, 274]; see Levin and Levy, *Persuading the Jury,* 105 U.Pa.L.Rev. 139, 162-163; 54 Colum. L.Rev. 946, 958.) ▮▮▮ In the present case, however, the prosecutor went beyond merely urging severe punishment. He stated as a fact the vigorously disputed proposition that capital punishment is a more effective deterrent than imprisonment. The Legislature has left to the absolute discretion of the jury the fixing of the punishment for first degree murder. (*People* v. *Green,* 47 Cal.2d 209, 232 [302 P.2d 307]; *People* v. *Friend, supra,* 767-768.) There is thus no legislative finding, and it is not a matter of common knowledge, that capital punishment is or is not a more effective deterrent than imprisonment. Since evidence on this question is inadmissible, argument thereon by prosecution or defense could serve no useful purpose, is apt to be misleading, and is therefore improper. It is true that in *People* v. *Friend,* 47 Cal.2d 749, 766-768 [306 P.2d 463], we stated that counsel could advance "arguments as to which penalty will better serve the objectives of punishment" and listed deterrence of crime as one of those objectives. To the extent that *People* v. *Friend* is inconsistent with our conclusion herein it is overruled. That decision, however, was binding on the trial court

at the time this case was tried, and it would have been an idle act for defendant to object in the trial court to the prosecutor's argument that capital punishment is a more effective deterrent than imprisonment. He is therefore not precluded from raising the question for the first time on appeal. (*People* v. *Kitchens*, 46 Cal.2d 260, 262-263 [294 P.2d 17], and cases cited.)

The prosecutor also asserted without any evidence in the record that many criminals use empty guns and that they do so because of fear of the death penalty, and he related alleged conversations between police and criminals that were not in evidence. These facts also are not a matter of common knowledge. (*Commonwealth* v. *Sykes*, 353 Pa. 392 [45 A.2d 43, 45] ; see Levin and Levy, *Persuading the Jury*, 105 U.Pa. L.Rev. 139, 162-163.) Since judicial notice by a jury is more limited than judicial notice by the trial court (McCormick, Evidence, p. 691), facts are deemed within the common knowledge of the jury only if they are matters of common human experience or well known laws of natural science. (See *Commonwealth* v. *Sykes*, *supra*, 353 Pa. 392 [45 A.2d 43, 45] ; McCormick, Evidence p. 691; Levin and Levy, *Persuading the Jury*, 105 U.Pa.L.Rev. 139, 157-167.) Thus in *Commonwealth* v. *Sykes*, *supra*, the Supreme Court of Pennsylvania held that statistics allegedly indicating that the number of murders has decreased in states that have abolished capital punishment were not a matter of common knowledge and could not be used by defense counsel in his closing argument.

Although counsel may illustrate a general truth, the illustration must not degenerate into an improper assertion of specific facts bearing on the case in hand. (See 6 Wigmore, Evidence (3d ed. 1940) § 1807, p. 266.) In the present case under guise of illustration the prosecutor improperly attempted to furnish specific facts to support his argument.

Such statements have never been sanctioned; however, since defendant did not object to them, he ordinarily could not raise the issue of their propriety on appeal unless they were of such character that the error could not have been cured by prompt admonition and instructions of the trial court. (*People* v. *Hampton*, 47 Cal.2d 239, 240 [302 P.2d 300] ; *People* v. *Kirkes*, *supra*, 39 Cal.2d 719, 725-727; *People* v. *Sampsell*, 34 Cal.2d 757, 764 [214 P.2d 813] ; *People* v. *Johnson*, 153 Cal.App.2d 564, 570-571 [314 P.2d 751].) This

rule applies to defendants who have refused counsel as well as to those represented by counsel. (*People* v. *Brajevich,* 174 Cal.App.2d 438, 447 [344 P.2d 815].) We cannot consider the prosecutor's improper statements of fact in the abstract, however, for they were part and parcel of his erroneous argument with respect to the deterrent effect of the death penalty. Moreover, even if that argument were otherwise proper, an admonition to disregard his improper statements of fact would not have cured the error. This is not a case in which a misstatement of law or of the evidence in the record could have been corrected by the court or the prosecutor himself had it been called to their attention. (See *People* v. *Sampsell,* 34 Cal.2d 757, 763-765 [214 P.2d 813].) The prosecutor firmly believed that the death penalty is a more effective deterrent than imprisonment and that the facts that he advanced in support of his belief were true. Surely he would not have been willing to recant his statements had defendant objected, and the trial court could not have labelled them as erroneous without itself giving inadmissible hearsay and opinion evidence in support of defendant. At most it could admonish the jury to disregard the prosecutor's statements; it could not erase them from the jurors' minds or explain why they should not be considered without further magnifying their impact.

 The prosecutor's argument that the death penalty was essential to deter murder was not a minor part of his appeal to the jury for that penalty. It was one of the three main points around which he built his argument, and he supported it with statements of fact he surely should have known he was not entitled to make. In *People* v. *Linden,* 52 Cal.2d 1, 27 [338 P.2d 397], we pointed out that error tending to affect the jury's attitude in fixing the penalty "implicitly invites reversal in every case. Only under extraordinary circumstances can the constitutional provision [art. VI, § 4½] save the verdict." We find no such circumstances in this case, and we are convinced that it is "reasonably probable that a result more favorable" to defendant "would have been reached in the absence of the error" and that accordingly the error is prejudicial. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

The judgment imposing the death penalty and the order denying a new trial on the question of penalty are reversed, and the cause is remanded for retrial and redetermination of the question of penalty only and for the pronouncement of

a new sentence and judgment in accordance with such determination and the applicable law.

Gibson, C. J., Peters, J., White, J., and Dooling, J., concurred.

McCOMB, J.—I dissent.

*First*: I do not believe that the district attorney's argument to the jury constituted prejudicial misconduct.

In my opinion, it is a matter of common knowledge that the death penalty is a deterrent, because:

(a) Christians and Jews from the beginning of recorded history have recognized that the death penalty is a deterrent to murder.

This is demonstrated by the fact that, according to the account contained in the Old Testament (see New American Catholic Edition, The Holy Bible (1950)), the Lord spoke to Moses and said: "He that striketh and killeth a man: dying let him die." (Leviticus 25, verse 17.) "If any man strike with iron, and he die that was struck: he shall be guilty of murder, and he himself shall die. If he throw a stone, and he that is struck die: he shall be punished in the same manner. If he that is struck with wood die: he shall be revenged by the blood of him that struck him. . . . These things shall be perpetual, and for an ordinance in all your dwellings. . . . You shall not take money of him that is guilty of blood: *but* he shall die forthwith." (Numbers 35, verses 16-31.)

(b) In the early history of the western states of the United States of America, including California, the death penalty was imposed by the early settlers to stop the rustling of cattle. It is a matter of common knowledge that in the early days of this state the apprehension and hanging of cattle rustlers reduced, and almost stopped, the theft of cattle.

(c) In the early history of San Francisco, law enforcement broke down and chaotic conditions prevailed. A group of citizens, known as the Vigilantes, undertook to restore order. To do this, they apprehended criminals and after trial promptly executed the guilty parties. Order was restored, and the civil authorities assumed control again. Clearly fear of the death penalty was the basic reason for the restoration of order.

(d) Any prosecuting attorney or criminal defense attorney or any trial judge who has sat for a substantial period in a department of the superior court devoted to the trial of felony

cases knows that many felons are careful to refrain from arming themselves with a deadly weapon because they do not want to take the chance of killing anyone and suffering death as a penalty.

A few recent examples of the accuracy of this view are to be found in the following cases involving persons arrested by officers of the Los Angeles Police Department:[*]

(i) Margaret Elizabeth Daly, of San Pedro, was arrested August 28, 1961, for assaulting Pete Gibbons with a knife. She stated to investigating officers: "Yeh, I cut him and I should have done a better job. *I would have killed him but I didn't want to go to the gas chamber.*"

(ii) Robert D. Thomas, alias Robert Hall, an ex-convict from Kentucky; Melvin Eugene Young, alias Gene Wilson, a petty criminal from Iowa and Illinois; and Shirley R. Coffee, alias Elizabeth Salquist, of California, were arrested April 25, 1961, for robbery. They had used toy pistols to force their victims into rear rooms, where the victims were bound. When questioned by the investigating officers as to the reason for using toy guns instead of genuine guns, all three agreed that real guns were too dangerous, *as if someone were killed in the commission of the robberies, they could all receive the death penalty.*

(iii) Louis Joseph Turck, alias Luigi Furchiano, alias Joseph Farino, alias Glenn Hooper, alias Joe Moreno, an ex-convict with a felony record dating from 1941, was arrested May 20, 1961, for robbery. He had used guns in prior robberies in other states but simulated a gun in the robbery here. He told investigating officers that he was aware of the California death penalty although he had been in this state for only one month, and said, when asked why he had only simulated a gun, *"I knew that if I used a real gun and that if I shot someone in a robbery, I might get the death penalty and go to the gas chamber."*

(iv) Ramon Jesse Velarde was arrested September 26, 1960, while attempting to rob a supermarket. At that time, armed with a loaded .38 caliber revolver, he was holding several employees of the market as hostages. He subsequently escaped from jail and was apprehended at the Mexican border. While being returned to Los Angeles for prosecution, he made the following statement to the transporting officers: "I think I

---

[*]The cases cited are taken from the records on file in the Los Angeles Police Department.

might have escaped at the market if I had shot one or more of them. *I probably would have done it if it wasn't for the gas chamber.* I'll only do 7 or 10 years for this. I don't want to die no matter what happens, you want to live another day.''

(v) Orelius Mathew Stewart, an ex-convict, with a long felony record, was arrested March 3, 1960, for attempted bank robbery. He was subsequently convicted and sentenced to the state prison. While discussing the matter with his probation officer, he stated : ''The officer who arrested me was by himself, and if I had wanted, I could have blasted him. *I thought about it at the time, but I changed my mind when I thought of the gas chamber.''*

(vi) Paul Anthony Brusseau, with a criminal record in six other states, was arrested February 6, 1960, for robbery. He readily admitted five holdups of candy stores in Los Angeles. In this series of robberies he had only simulated a gun. When questioned by investigators as to the reason for his simulating a gun rather than using a real one, he replied that *he did not want to get the gas chamber.*

(vii) Salvador A. Estrada, a 19-year-old youth with a four-year criminal record, was arrested February 2, 1960, just after he had stolen an automobile from a parking lot by wiring around the ignition switch. As he was being booked at the station, he stated to the arresting officers: ''I want to ask you one question, do you think they will repeal the capital punishment law. *If they do, we can kill all you cops and judges without worrying about it.''*

(viii) Jack Colevris, a habitual criminal with a record dating back to 1945, committed an armed robbery at a supermarket on April 25, 1960, about a week after escaping from San Quentin Prison. Shortly thereafter he was stopped by a motorcycle officer. Colevris, who had twice been sentenced to the state prison for armed robbery, knew that if brought to trial, he would again be sent to prison for a long term. The loaded revolver was on the seat of the automobile beside him, and he could easily have shot and killed the arresting officer. By his own statements to interrogating officers, however, *he was deterred from this action because he preferred a possible life sentence to death in the gas chamber.*

(ix) Edward Joseph Lapienski, who had a criminal record dating back to 1948, was arrested in December 1959 for a holdup committed with a toy automatic type pistol. When questioned by investigators as to why he had threatened his victim with death and had not provided himself with the

means of carrying out the threat, he stated, *"I know that if I had a real gun and killed someone, I would get the gas chamber."*

(x) George Hewlitt Dixon, an ex-convict with a long felony record in the East, was arrested for robbery and kidnaping committed on November 27, 1959. Using a screwdriver in his jacket pocket to simulate a gun, he had held up and kidnaped the attendant of a service station, later releasing him unharmed. When questioned about his using a screwdriver to simulate a gun, this man, a hardened criminal with many felony arrests and at least two known escapes from custody, indicated his fear and respect for the California death penalty and stated, *"I did not want to get the gas."*

(xi) Eugene Freeland Fitzgerald, alias Edward Finley, an ex-convict with a felony record dating back to 1951, was arrested February 2, 1960, for the robbery of a chain of candy stores. He used a toy gun in committing the robberies, and when questioned by the investigating officers as to his reasons for doing so, he stated: "I know I'm going to the joint and probably for life. *If I had a real gun and killed someone, I would get the gas. I would rather have it this way."*

(xii) Quentin Lawson, an ex-convict on parole, was arrested January 24, 1959, for committing two robberies, in which he had simulated a gun in his coat pocket. When questioned on his reason for simulating a gun and not using a real one, he replied that *he did not want to kill someone and get the death penalty.*

(xiii) Theodore Roosevelt Cornell, with many aliases, an ex-convict from Michigan with a criminal record of 26 years, was arrested December 31, 1958, while attempting to hold up the box office of a theater. He had simulated a gun in his coat pocket, and when asked by investigating officers why an ex-convict with everything to lose would not use a real gun, he replied, *"If I used a real gun and shot someone, I could lose my life."*

(xiv) Robert Ellis Blood, Daniel B. Gridley, and Richard R. Hurst were arrested December 3, 1958, for attempted robbery. They were equipped with a roll of cord and a toy pistol. When questioned, all of them stated that they used the toy pistol because *they did not want to kill anyone, as they were aware that the penalty for killing a person in a robbery was death in the gas chamber.*

(e) The people of the State of California have, through their Legislature, on many occasions considered whether the

death penalty should be abolished in this state—this as recently as the 1961 session of the Legislature—and in each instance have come to the conclusion that the death penalty is a deterrent and have retained it. Therefore, the judiciary of this state is bound to follow the legally expressed will of the sovereign people of the State of California.

*Second*: Defendant did not object to the prosecutor's statements. Therefore, he cannot raise the issue of their propriety on appeal unless they were of such character that the error could not have been cured by prompt admonition and instructions of the trial court. (*People* v. *Hampton,* 47 Cal.2d 239, 240 [3] [302 P.2d 300].) In my opinion, any alleged prejudice could have been cured by a prompt request for, and the giving of, an admonition and instructions by the trial judge.

*Third*: In my opinion, the trial judge properly exercised his discretion in denying the motion for a new trial on the penalty phase.

Any judge or attorney who has had trial court experience knows that a trial judge is not always familiar with all the procedural law at the outset of the trial of a case. This is particularly true at the present time and is in part due to the ever-changing rules of law. This view was recently expressed by Honorable Evelle J. Younger, of the Los Angeles Superior Court, in an address which he delivered before the Lawyers Club. The following report on Judge Younger's remarks appeared in one of the Los Angeles legal newspapers: ". . . .

"As an example Judge Younger noted the recent changes in the rules on admissibility of evidence obtained by illegal search and seizure. 'We have just recently run the gamut from the common law rule that such evidence was admissible in Federal or State courts regardless of how obtained, if of probative value, to absolute exclusion.' The latest rule of absolute exclusion was handed down this year in the case of *Dolly Mapp.* [*Dollree Mapp* v. *Ohio,* 364 U.S. 868 (81 S.Ct. 111, 6 L.Ed.2d 1081).]

"The result of these changes is that it becomes increasingly difficult for local peace officers to determine what are, and what are not, allowable procedures in 'coping with mounting criminal activity.' An arrest, he stated, cannot be justified if it shocks the conscience—but whose conscience is the determining factor? 'Not the community's. Not the Police Chief's. . . . We are talking about the conscience of the Ninth Member of the United States Supreme Court. And, we are not

talking about his conscience yesterday; we are talking about his tomorrow's conscience.'

"If judges and legal scholars have difficulty in defining due process, one can sympathize with the lonely policeman patrolling his beat who is expected to make legally correct split-second decisions, he commented.

". . . .

"The speaker concluded by reiterating, 'We must zealously guard the rights of individuals; but in protecting the individual charged with crime we should never lose sight of the rights of society.' " (Metropolitan News, Vol. XXXIX, No. 152 (8/31/61); The Los Angeles Daily Journal, Vol. LXXIV, No. 175 (9/1/61).)

The result is that a trial judge must rely to a large measure upon the information furnished him by the attorneys appearing before him. In the present case this was done. After the trial judge expressed doubts as to his authority to reweigh the evidence following the jury's fixing of the death penalty, counsel for defendant pointed out to him that he did have such authority. Whereupon the judge accepted the view that he had authority on the motion for a new trial to reweigh the evidence as to the application of the death penalty. He then stated that assuming he had such authority, he would deny the motion, as the penalty was properly imposed, and that this view was supported by the fact that three juries had imposed the death penalty for the crime of which defendant was convicted.

The problem presented is not a mere academic one. The people of this state are faced with an extremely important situation.

I would affirm the judgment and the order denying the motion for a new trial.

SCHAUER, J., Dissenting.—I concur in the conclusions stated by Mr. Justice McComb and in his reasoning. I find it necessary, however, to emphasize my differences with the majority opinion.

I can understand with the majority that there is a reasonably debatable question as to whether the record affirmatively and satisfactorily shows that the trial court performed its full duty to independently weigh the evidence as required by *People* v. *Borchers* (1958) 50 Cal.2d 321, 328 [1, 2], 330 [9, 10] [325 P.2d 97] and *People* v. *Moore* (1960) 53 Cal.2d 451, 454 [2] [348 P.2d 584]. However, construing the record

favorably to affirmance, as is the duty of a reviewing court, I am satisfied with Justice McComb's conclusion that the judgment should be affirmed.

The reversal of a judgment in a case of this character (and this is a second reversal in the same case) even when clearly required under established law, is in itself a serious matter. But far transcending the importance of the reversal in adverse effect on law enforcement, are certain pronouncements in the opinion (hereinafter quoted) which, whether so intended or not, constitute an attack on the death penalty. I cannot find justification in fact or in law for the majority's criticism of the prosecutor's argument to the jury regarding the death penalty or for the pronouncements which constitute an undermining attack on that penalty.

The majority relate that "For the third time a jury has fixed defendant's penalty at death for the murder of his wife. . . . [After the first trial] the trial court granted a new trial on the ground of newly discovered evidence, and we affirmed. [Citation.] Defendant was again . . . found guilty . . .; again the jury fixed the penalty at death. We affirmed the judgment as to the adjudication that defendant is guilty of murder of the first degree and was sane. . . . We reversed [McComb, J., and Schauer, J., dissenting] . . . as to the imposition of the death penalty because of the admission of evidence tending to inflame and prejudice the jury. (*People* v. *Love* [1960] 53 Cal.2d 843 [350 P.2d 705].)"

The order of the majority in the above referred to reversal is as follows (p. 858 of 53 Cal.2d): "The judgment is reversed as to the imposition of the death penalty, and the cause is remanded for retrial and redetermination of the question of penalty only and for the pronouncement of a new sentence and judgment in accordance with such determination and the applicable law." The applicable law includes the provision of section 190.1 of the Penal Code, that "Evidence may be presented at the further proceedings on the issue of penalty, of the circumstances surrounding the crime, of the defendant's background and history, *and of any facts in aggravation or mitigation of the penalty*. The determination of the penalty of *life imprisonment or death* shall be . . . *on the evidence presented*. . . ." (Italics added.)

Yet today the majority rule that (*ante,* p. 729) "Since it appears, . . . that the prosecutor committed prejudicial misconduct in arguing the deterrent effect of the death penalty to the jury, the judgment . . . must be reversed."

What possible rationality can be found in the provision of section 190.1 that "Evidence may be presented . . . on the issue of penalty . . . and of *any facts in aggravation or mitigation* of the penalty" if evidence and argument cannot be addressed to what is then the sole issue in litigation? What can the words "Evidence . . . in aggravation or mitigation of the penalty" mean if they do not relate to a basis for selecting as between the more drastic penalty—the greater deterrent—and the mitigated one of imprisonment?

I agree with the majority that (*ante*, p. 725) "The court did not err in dismissing defendant's subpoena for Governor Brown and Warden Duffy. . . . He had subpoenaed Governor Brown to elicit his views on capital punishment. The penalties for first degree murder have been fixed by the Legislature. (Pen. Code, § 190.) The wisdom or deterrent effect of those penalties are for the Legislature to determine and are therefore not justiciable issues. [Manifestly the Legislature has made the determination.] Hence evidence as to these matters is inadmissible." Certainly the above holding is correct. But most assuredly no inference can properly be drawn from that holding that the Legislature has left any doubt that on its findings and in its judgment both the death penalty—for its greater deterrent effect, particularly in aggravated cases—and so-called life imprisonment—with its lesser effect for mitigated cases—are essential for the protection of society in California.

But in contrast to the law the majority go on to assert that the judgment here must be reversed and remanded for a new (fourth) trial on the issue of penalty because: "[The prosecutor] stated as a fact the vigorously disputed proposition that capital punishment is a more effective deterrent than imprisonment." Would "vociferously" perhaps be a more accurate adverb than "vigorously"? And since, as the majority already had held, the Legislature has fixed the penalties for first degree murder and they "are therefore not justiciable issues," why should the prosecutor not accept the findings of the Legislature and the law as to the two alternative penalties, exactly as he did, and offer evidence and argument pertinent to the jury's performance of duty, as clearly contemplated by the Legislature in its enactment of Penal Code sections 190 and 190.1?

The majority continue: "The Legislature has left to the absolute discretion of the jury the fixing of the punishment

for first degree murder [i.e., without any control by the judge of *their* discretion but, of course, presumably rationally in the light of the evidence]. [Citation.] *There is thus no legislative finding, and it is not a matter of common knowledge, that capital punishment is or is not a more effective deterrent than imprisonment."* The italicized pronouncement, in my view, is obnoxious to fact and law. Unsupported by statute or prior decision, it is a blow which appears to be aimed directly against rational application, and therefore toward ultimate abolition, of the death penalty. If the quoted italicized pronouncement were true—that there is neither legislative finding nor common knowledge "that capital punishment is or is not a more effective deterrent than imprisonment" then, of course, the death penalty should be abolished.

Further implementing its tenet the majority opinion continues: "Since evidence on this question [presumably evidence in aggravation or mitigation of penalty as contemplated by Pen. Code, § 190.1] *is inadmissible,* argument thereon by prosecution or defense could serve no useful purpose, is apt to be misleading, and is therefore improper. It is true that in *People* v. *Friend* [1957] 47 Cal.2d 749, 766, 768 [306 P.2d 463], we stated that counsel could advance 'arguments as to which penalty will better serve the objectives of punishment' and listed deterrence of crime as one of those objectives. To the extent that *People* v. *Friend* is inconsistent with our conclusion herein it is overruled." (Italics added.)

By the above quoted holdings the majority in effect place the prosecutor in a forensic strait jacket as to argument for the greater deterrent. Those holdings also effectually emasculate the provision of Penal Code section 190.1, for the taking of evidence to aid the jury in making an intelligent and informed selection as between the alternative, but by no means equal, penalties of death or imprisonment. In so doing it appears to me that the majority action trenches upon an invasion of the legislative province in disregard of the distribution of powers prescribed by California Constitution, article III, section 1. (Compare *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211, 213-221 [11 Cal.Rptr. 89, 359 P.2d 457]; see also dissenting opinion, pp. 221-224; Civ. Code, § 22.3; Stats. 1961, ch. 1404, p. 3209.) To the same end today's majority also disregard the doctrine of *stare decisis* in overruling (as above quoted) the decisional law which admittedly had bound the trial court at the time of trial.

Although overruling the cited decision the majority rely on

it as a basis for reversal. They say "That decision [*Friend* (1957)], however, was binding on the trial court at the time this case was tried, and it would have been an idle act for defendant to object in the trial court to the prosecutor's argument that capital punishment is a more effective deterrent than imprisonment. He is therefore not precluded from raising the question for the first time on appeal." The trial court thus is reversed for following the law as it existed at the time of trial—*and as it also existed at the time of this court's first reversal of the judgment and remand "for retrial and redetermination of the question of penalty only."*

Actually the correct rules, as had been held by this court in the *Friend* (1957) decision, relative to the selection of penalty (as between death and so-called life imprisonment) are stated or indicated in the now overruled case. Insofar as appears proper to be quoted here, the opinion in that case declares (p. 764 [8] of 47 Cal.2d): "We note . . . that the trend is toward the more liberal admission of evidence pertinent only to the selection of penalty. For example, it has become established practice to advise the jury *of the facts* concerning the possibilities of pardon, commutation, parole, etc. [Citations.] Obviously, *the law* pertaining to pardons, commutations and paroles has not the slightest relevancy to the issue of guilt; it is pertinent only as a *fact* which may be considered in selecting the penalty to be imposed; i.e., it is evidence which may be considered as relevant to the 'aggravation' or 'mitigation' of punishment in the sense in which those terms have been used in relation to the selection of penalty. . . . [P. 767 [13].] They [the jury] should be told . . . that beyond prescribing the two alternative penalties the law itself provides no standard for their guidance in the selection of the punishment; . . . that in deciding the question whether the accused should be put to death or sentenced to imprisonment for life it is within their discretion alone to determine, each for himself, how far he will accord weight to the considerations of the *several objectives of punishment, of the deterrence of crime,* of the *protection of society,* of the *desirability of stern retribution, or of sympathy or clemency, . . .*" (Italics in last sentence added.) We pointed out also that (fn. 8, p. 766) "For some years many courts and writers on criminal law and penology have held that the purpose of legally adjudicated punishment is not or should not be vengeance, but rather *deterrence* of the offender and *other prospec-*

*tive offenders from crime, . . ."* (Italics added.) All of the
foregoing, the majority today brush aside.

Regardless of individual preferences among the justices I
deem it to be the duty of this court to accept the fact that the
Legislature has determined that the death penalty, in the cases
wherein it is prescribed, is the strongest deterrent against the
commission of such crimes. The fact that the jury (or the
trial judge) has a final power of determination as to whether
the death penalty or life imprisonment shall be imposed in a
given case is of course *not* a legislative determination that life
imprisonment is an equally strong deterrent. It merely shows
the concern of the Legislature that liability to suffer the
strongest deterrent be surrounded by the strongest safeguards
for the accused. Even as the death penalty is the strongest
deterrent against murder, so is it also the most effective
protector of the lives of the victims of those who deliberately
choose the commission of crimes of violence as a profession.

That the ever present potentiality in California of the death
penalty, for murder in the commission of armed robbery,[1]
each year saves the lives of scores,[2] if not hundreds of victims
of such crimes, cannot I think, reasonably be doubted by any
judge who has had substantial experience at the trial court
level wth the handling of such persons. I know that during
my own trial court experience, which although not extensive
in criminal law, included some four to five years (1930-1934)
in a department of the superior court exclusively engaged in
handling felony cases, I repeatedly heard from the lips of
robbers—some amateurs (no prior convictions), some profes-
sionals (with priors)—substantially the same story: "I used a
toy gun [or a simulated gun or a gun in which the firing pin
or hammer had been extracted or damaged] because I didn't
want my neck stretched." (The penalty, at the time referred
to, was hanging; death by lethal gas was substituted in 1941.)

---

[1]I use robbery as the example for discussion because the deterrent
effect of the death penalty for murder in the commission of (or attempt
to commit) robbery is particularly well known among law enforcement
officers who handle such cases at the investigation, arrest, and trial
court levels. The point of my discussion, however, is equally applicable
to the deterrent effect of the death penalty against harming kidnap
victims and against murder committed in the perpetration or attempt
to perpetrate arson, rape, burglary, mayhem or lascivious acts upon a
child under the age of 14. (See Pen. Code, §§ 209, 189, 190, and 288.)

[2]According to the 1958-1960 Report of the Department of Justice the
number of robberies reported in California in 1959 was 11,548.

It may be noted also that in the same year 108,002 burglaries were
reported in this state.

I, of course, recognize that there are persons who in all sincerity urge that the death penalty be abolished. They point to the cases which reach the courts and say: "See, it has not deterred the commission of these crimes." Certainly the potentiality of the penalty is not 100 per cent effective as a deterrent *as to all criminals*. But it would be absurd to claim that because it did not deter *all* it did not deter *any*. As to each victim of each armed robbery whose life is spared because that one robber was deterred from killing, I dare say that the victim and his loved ones would not quibble over the percentage of the deterrent's efficacy.

There are also persons who entertain a conscientious scruple against *any* taking of human life. When a person who conscientiously believes that the state should never take a human life is called upon to take part in the operation of a death penalty law he, understandably—being conscientious in duty as well as in personal conviction—will suffer grievously. Whether he shall advocate repeal of the law would be one thing; urging forbearance of execution might be another. But regardless of whether a person has or has not any official connection whatsoever with law enforcement, and whether he realizes it or not, the death penalty law is a matter of importance to his safety. Whether any citizen would urge amendment of the law to make its application more swift and sure, or would repeal it altogether, or change it otherwise, the decision he makes should be of grave concern to him—and to his neighbors. Certainly each person must live with his own conscience. It is, however, to be hoped that his decision, as to any action affecting the death penalty which is motivated by conscience, will be an enlightened decision; that the decision he makes will be more than superficially consistent with his true objective. To make such a decision requires thinking— and information. By information, I mean facts, not theories. Probably all of us who have thought on the subject—and particularly those of us who have some responsibility in these cases (even as remote as it is at the appellate level)—devoutly wish that the death penalty were no longer necessary. But we have not yet reached the state which Sir Thomas More envisioned. Until a Utopian government has become reality, organized society (if it is to exist) must continue on the posit of free will and personal responsibility for one's choices of action (see *People* v. *Gorshen* (1959) 51 Cal.2d 716, 724 [336 P.2d 492]) with sanctions for crimes appropriate to their

gravity. A good government owes protection to its law abiding citizens.

Let us consider further this business of armed robbery. It is much more profitable, ordinarily, than burglary but it entails more risk. Robbery means facing the victim and taking the property "from his person or immediate presence . . . against his will, accomplished by means of force or fear." (Pen. Code, § 211.) The victim (if not blind and deaf) is a potential witness. Robbery is "in the first degree" if "perpetrated by torture or by a person being armed with a dangerous or deadly weapon. . . ." (Pen. Code, § 211a.) Other kinds of robbery are of the second degree. Robbery in the first degree is punishable "by imprisonment in the state prison . . . for not less than five years;" that of the second degree, by like imprisonment "for not less than one year." (Pen. Code, § 213.) The *maximum in both cases is life imprisonment.* Few, if any, law-respecting people would contend that these sentences, particularly in view of the early parole probabilities, are too severe.

The risk of undergoing such a sentence is just as much a calculated risk of the professional robber as is the risk of deflation (or competition) a calculated risk of the conventional businessman. But the robber can do one thing that will vastly decrease the risk of identification and conviction: he can eliminate the known witnesses—the victims he robs. To accomplish any robbery he must at least make a show of force and induce fear; and for that reason he usually carries a gun— or something that looks like a gun. It cannot be validly disputed that the choice as to which he carries—a gun or what looks like a gun—is in case after case controlled solely by his respect for the death penalty. If the punishment he risks for robbery is to be imprisonment—and only imprisonment, even if he eliminates the only witness—it would seem inevitable that the incentive to kill would be greatly increased. The greater chance of escaping any punishment would, in the minds of some at least, outweigh the slighter risk of having the term increased. Many a robber who would take the risk of a longer term would absolutely shun any plan which substituted death for imprisonment.

And now I return to the subject of conscientious scruples against the execution of a human being. From what has already been said it must be obvious that I understand that it would be poignantly desirable (in the faithful performance of their law enforcement duties) for jurors and trial judges

particularly, and also for justices of courts of review, and governors or other officers having the power of commutation, if the death penalty were abolished. But I comprehend also that it would be tragically undesirable to the families of the innocent victims who would die violently as a result.

Because of what my own eyes have seen and my ears have heard I cannot doubt the efficacy of the death penalty as a savior of the lives of victims of robbers, kidnapers, burglars, and criminals of similar dispositions. But if there were doubt in my mind I should resolve it in favor of protecting the innocent victims of the future rather than sparing the guilty killers of the past.

Inasmuch as today's majority opinion (1) may well be construed as at least approaching an invitation to the Legislature to repeal the death penalty; (2) as it declares a proposition which, if accepted, would constitute a basis arguably demanding repeal;[3] and (3) as it shackles district attorneys and trial courts in effective administration of the present law as it was enacted, it may well be that the Legislature should give attention to the legislation so affected. In that connection, in view of today's court action and of the entire record of appeals from penalty determinations under Penal Code sections 190 and 190.1 (as those sections were, respectively, amended and added by Stats. 1957, ch. 1968, p. 3509, and Stats. 1959, ch. 738, p. 2727), the Legislature perhaps will wish to give consideration to the possible desirability of eliminating the alternative of imprisonment *in certain situations* to be designated by the Legislature, and making the greater deterrent the sole penalty, to follow as a matter of law on final conviction in any such designated situation. It would seem that, if such action is contemplated, the Legislature in its study might consider whether the greater deterrence of such certainty might reasonably be made applicable to those who *personally* would kill, or direct another to kill, "in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288," or in kidnaping. (See Pen. Code, §§ 189, 209.)

Finally, I emphasize: each person who officially or unofficially participates in or advocates enforcement, repeal or amendment of the subject law—and who receives the benefits of its protection—must live with his own conscience. But I re-

---

[3] Why, indeed, should it not be repealed if, as the majority declare, it is no more of a deterrent to murder than is mere imprisonment?

spectfully and earnestly urge that he who would consider repealing or otherwise defeating operation of this law, the principal purpose of which is to protect the lives of the victims of crimes of violence, will either make sure that the information on which he acts is sound and convincing or will pause to consider what his conscience may tell him as to some measure of moral responsibility for the "eliminations" which reason suggests may thereby be encouraged.

McComb, J., concurred.

Respondent's petition for a rehearing was denied December 1, 1961. Schauer, J., and McComb, J., were of the opinion that the petition should be granted. The following opinions were then rendered:

SCHAUER, J., and McCOMB, J., Dissenting.—The Attorney General has filed on behalf of the People of California a petition for rehearing in which he presents facts, law, and argument supporting his request that this court reconsider its majority decision filed November 2, 1961. The petition has been denied but the arguments of the Attorney General remain fundamentally unanswered.

Such arguments are founded on facts which have been generally recognized in organized society since time immemorial and on the law of this state as it had existed in all material respects, until the majority's unprecedented pronouncement, from at least the time that the Penal Code was adopted in 1872. Only the fiat of the majority denies validity to the clearly expressed intention (and implied finding) of the Legislature (Pen. Code, §§ 190 and 190.1) that evidence and argument in *aggravation* of the penalty mean evidence and argument for the penalty of death, while evidence and argument in *mitigation* of penalty seek so-called life imprisonment in contrast to death. How can it be said that a governor can *commute* a death sentence to imprisonment unless the latter be a mitigated, i.e., a lesser punishment? A mitigated punishment is, of course, a lesser deterrent than an aggravated punishment. If this be not true, we should abandon a society based on the premise that man is a free agent; *a fortiori* we should scrap the entire system of modern penology because it is based on the concept that man is a free moral agent, a reasoning being responsive to sanctions and benefits. And if the aggravated punishment is not a greater deterrent than the

lesser then it would be simply cruel and unnecessary; hence it would violate section 6 of article I of our Constitution and be void.

We observe that as a matter of simple logic the majority's decision must inevitably tend to encourage murders in the commission of crimes of violence, hence to increase for every citizen, and particularly for law enforcement officers, the hazard of death by violence; further, we note that the opinion fails to respect the necessarily implied finding of the Legislature as to the deterrent effect of the death penalty, implicit in the express provisions for the trial of the penalty issue in capital cases (see Pen. Code, §§ 190 and 190.1) which were enacted following and implementing our decision in *People* v. *Friend* (1957) 47 Cal.2d 749, 764 [8], 766 (fn. 8), 767 [13] [306 P.2d 463]. Instead of respecting, the majority opinion effectually emasculates, the penalty selection provisions of section 190.1 and overrules the decision which the Legislature had thereby implemented and which concededly had been the law of this state when the case was tried.

Because the petition for rehearing (signed by Attorney General Stanley Mosk, by Assistant Attorney General Doris H. Maier, and by Deputy Attorney General Raymond M. Momboisse) so cogently, albeit respectfully, presents the case for the People, and because of the grave import of this decision to peace officers, to the law-abiding public and to the Legislature, we deem it proper to, and we do, incorporate herein the major portion of the petition, as follows:

"This Court has held that it was error for the district attorney to argue that the death penalty is a more effective deterrent than life imprisonment as there is no legislative finding, and it is not a matter of common knowledge, that capital punishment is or is not a more effective deterrent than imprisonment. Further, this Court found that it was error for the prosecutor to assert, without any evidence in the record, that many criminals use empty guns and that they do so because of the fear of the death penalty.

". . . .

"Certainly it was the intent of the Legislature in enacting section 190.1 of the Penal Code to codify the law as expressed in *People* v. *Friend,* 47 Cal.2d 749 [306 P.2d 463], that at the penalty phase the jury should be fully advised of the consequences of the penalties which might be imposed.

"This Court in *People* v. *Friend,* 47 Cal.2d 749, at 765-768 [306 P.2d 463], held that to aid the jury to act in-

telligently in making their selection of the alternative penalties, counsel may properly argue their respective views as to which punishment, under all the circumstances shown, will be more appropriate and desirable in the cause of justice. To that end, appeals to reason in the exercise of the jury's discretion were held to be proper, as were appeals for clemency or for stern retribution.

"This Court went on to outline the great responsibility placed upon members of the jury and the difficultness of that verdict. Naturally in the conscientious discharge of their duty, jurors are eager to have, and have a right to have given to them, all the guidance the law can offer. Among those things which this Court at that time felt were essential for an intelligent determination by the jury were arguments as to which penalty will better serve the objectives of punishment. Among those objectives this Court recognized deterrents [sic] to the offender, and other prospective offenders.

"*People* v. *Friend* was decided on January 25, 1957. In that same year the Legislature added section 190.1 to the Penal Code, in which it was provided that there should be a separate trial to pass on the question of penalty when one of the alternative penalties was death. At that trial 'Evidence may be presented . . . of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty.'

"It is presumed that the Legislature at the time it enacted this statute knew of the decision of this Court in the case of *People* v. *Friend*, 47 Cal.2d 749 [306 P.2d 463] (*Kusior* v. *Silver*, 54 Cal.2d 603, 618 [7 Cal.Rptr. 129, 354 P.2d 657]).

"Indeed it could be said, as was held by this Court in *People* v. *Nash*, 52 Cal.2d 36, 47 [338 P.2d 416], that it is apparent the Legislature had in mind the law and presumably knew of the existing domestic decisional law in this regard and intended not to change it. Rather, by utilizing the judicially construed words 'aggravation or mitigation of the penalty,' the Legislature indicated its intent that the judicial definition should continue as the law of this State.

"After the enactment of section 190.1 of the Penal Code and its amendment in 1959 (Stats. 1959, Ch. 738) this Court in *People* v. *Love*, 53 Cal.2d 843, 856 [350 P.2d 705], indicated that the *Friend* decision still stated the permissible range on inquiry on the issue of penalty.

"We respectfully suggest that the opinion of this Court in *People* v. *Friend* was correct, that it was adopted by the

Legislature when it enacted section 190.1 of the Penal Code and should be the controlling law in this case.

"This Court has repeatedly held that the jury could be informed of the minimum term a person given a life sentence for first degree murder must serve and the minimum average and maximum terms actually being served for first degree murder in California (*People* v. *Purvis,* 52 Cal.2d 871, 884 [346 P.2d 22] ; *People* v. *Friend,* 47 Cal.2d 749, 755 [306 P.2d 463] ; *People* v. *Green,* 47 Cal.2d 209, 217 [302 P.2d 307]). The reason put forth by the court was that such matter is essential in ascertaining the significance of a life sentence and thus at arriving at an intelligent evaluation of the penalty to be imposed.

"Certainly the same is equally true when dealing with deterrent effect of the penalties involved.

"We respectfully suggest that the opinion of this Court in *People* v. *Friend* was correct, and that it is essential that the jury be advised of the deterrent effect of capital punishment in order that they may intelligently and effectively perform the grave responsibility given to them.

"We are thus confronted with the question of whether or not capital punishment is a deterrent.

"Logically it is indisputable that death is the greatest deterrent possible and as stated by Justice McComb it is a matter of common knowledge that the death penalty is a deterrent.

"The use of the word 'lawfully' in our criminal statutes implies that the person knows what he is doing, intends to do what he is doing, and is a free agent (*People* v. *Trombley,* 41 Cal.2d 801, 807 [*sic, In re Trombley,* 31 Cal.2d 801, 807 (193 P.2d 734)]).

"This Court quite recently reaffirmed its belief in the dignity of man when in *People* v. *Nash,* 52 Cal.2d 36 [338 P.2d 416], at 50, it reiterated the basic premise of all moral and social order and the cornerstone of criminal law, that man is a creature possessed of free will, charged with personal responsibility for his choice of action.

"Because man is a free agent and has a free will, it follows that his choice of action will be influenced by the consequences which will flow from it. Thus it follows that punishment for a crime will deter one from committing a crime. Thus at least one purpose of the penal law is to express a formal social condemnation of forbidden conduct, and buttress that condemnation by sanctions calculated to prevent that which is for-

bidden. The ultimate goal is deterrence (*Sauer* v. *United States*, 241 F.2d 640, 9th Cir., p. 648).

"If there is any validity to the theory that the purpose of legally adjudicated punishment is to deter the commission of crime, it must follow that death, which is the 'King of Terrors' (Job xviii, 14), which is the extreme penalty and is so generally considered (*People* v. *Gomez*, 209 Cal. 296, 300 [286 P. 998]), is the most effective deterrent.

"Certainly no one can seriously argue that insofar as the particular individual involved, capital punishment is without peer in its deterrent effect.

"Insofar as its deterrent effect on others, the Royal Commission on Capital Punishment in its report concluded that '*Prima facie* the penalty of death is likely to have a stronger effect as a deterrent to normal human beings than any other form of punishment, and there is some evidence (though no convincing statistical evidence) that this is in fact so' (page 24).

"Further proof of the effectiveness of the death penalty is to be found in answers to questionnaires circulated by the Subcommittee of the Judiciary Committee on Capital Punishment and found in its report pertaining to the problems of the death penalty and its administration in California. The overwhelming majority of judges, district attorneys and police officers were of the opinion that the death penalty should be retained. These are the men who are best qualified to arrive at such conclusion, for they are the individuals who are in direct contact with the criminal element in our society.

"Probably one of the best statements of this is the following remark of Sir James Fitzjames Stephen:

" 'No other punishment deters men so effectually from committing crimes as the punishment of death. This is one of those propositions which it is difficult to prove, simply because they are in themselves more obvious than any proof can make them. It is possible to display ingenuity in arguing against it, but that is all. The whole experience of mankind is in the other direction. The threat of instant death is the one to which resort has always been made when there was an absolute necessity for producing some result. . . . No one goes to certain inevitable death except by compulsion. Put the matter the other way. Was there ever yet a criminal who, when sentenced to death and brought out to die, would refuse the offer of a commutation of his sentence for the severest

secondary punishment? Surely not. Why is this? It can only be because "All that a man has will he give for his life." In any secondary punishment, however terrible, there is hope; but death is death; its terrors cannot be described more forcibly.' (Royal Commission on Capital Punishment, 1949-1953 Report, page 19.)

"Indeed, as stated by Justice Schauer in his dissent, if capital punishment is not a more effective deterrent than imprisonment, it must be abolished. Actually it would have been abolished before now, for history clearly establishes the fact that disproportionate penalties shock human feelings and result in the equalization of crime and punishment. Thus over the years the death penalty has been limited to crimes of great atrocity and danger to society which cannot otherwise be effectually guarded against.

"This principle has been recognized by our courts for it has been held that the Legislature may classify crimes and prescribe severer punishment for the commission of one class than for another as a deterrent against the commission of the more heinous crimes (*People* v. *Smith,* 218 Cal. 484, 489 [24 P.2d 166]).

"This certainly is reflected in the codes of the State of California wherein the Legislature imposes the death penalty only for the crimes of treason against the State (Pen. Code sec. 37), procuring the execution of an innocent person (Penal Code sec. 128), first degree murder (Penal Code secs. 189 and 190), train wrecking (Penal Code sec. 219), kidnaping with bodily harm (Penal Code sec. 209), and an aggravated assault by a life prisoner (Penal Code sec. 4500).

"Indeed, section 209 of the Penal Code is particularly demonstrative of the conclusion of the Legislature that the death penalty is by far a more effective deterrent than life imprisonment, for there when the person kidnaped suffers bodily harm, the punishment is to be life imprisonment without the possibility of parole, or death, whereas in those instances where the victim does not suffer bodily harm, the punishment is only imprisonment for life with the possibility of parole. This is proof that the Legislature recognizes that the death penalty is a more effective deterrent than mere life imprisonment.

"Likewise, as pointed out in both of the dissents, the People of the State of California have constantly been called upon in recent years through the Legislature to abolish the

death penalty. In each instance the conclusion has been that the death penalty is a deterrent and it has been retained.

"In the same vein, it is interesting to note that the People of the State of California have not been directly offered the opportunity to express their view in an election as to whether or not the death penalty should be abolished.

"It seems only reasonable to conclude that if the proponents of abolition believed that the majority of the people of this State did not believe in capital punishment, that they would at least attempt to submit the matter to a popular vote. The failure to do so is the best proof that even the advocates of abolishment are convinced that the majority of the people of this State believe that it is an effective deterrent and desire its retention.

"Historically it has been demonstrated that capital punishment is a most effective deterrent. Little can be added to the excellent summaries of history to be found in the dissents filed in this case. They vividly pointed out that throughout the history of Christians and Jews, and more particularly throughout the history of California, the death penalty has been universally considered and has proven to be the most effective deterrent.

"In addition to the effectiveness of the vigilantes referred to in the dissent of Justice McComb, we might add that similar activity in New Orleans in the 1890s resulted in an equally effective deterrent to crime.

"The best summary of our argument is found in these words . . . 'it is a matter of common knowledge that the death penalty is a deterrent.'

"In reference to that portion of the district attorney's argument wherein he stated that it is a known recognized fact that criminals will carry toy guns or unloaded guns because of the death penalty, we respectfully submit that this is legitimate argument, for it is history and a matter of common knowledge.

"In the dissent by Justice McComb numerous specific cases have been set forth which prove this argument is a correct reflection of history, as does the personal experience of Justice Schauer.

". . . .

"In the Royal Commission on Capital Punishment Report it was stated: 'From them we received virtually unanimous evidence, in both England and Scotland, to the effect that they were convinced of the uniquely deterrent value of capi-

tal punishment in its effect on professional criminals. On these the fear of the death penalty may not only have the direct effect of deterring them from using lethal violence to accomplish their purpose, or to avoid detection by silencing the victim of their crime, or to resist arrest. It may also have the indirect effect of deterring them from carrying a weapon lest the temptation to use it in a tight corner should prove irresistible. These witnesses had no doubt that the existence of the death penalty was the main reason why lethal violence was not more often used and why criminals in this country do not usually carry firearms or other weapons. They thought that, if there were no capital punishment, criminals would take to using violence and carrying weapons; and the police, who are now unarmed, might be compelled to retaliate' (page 21).

"Likewise, in the appendix to that report, page 335, specific instances were cited which confirm those set forth in Justices McComb's and Schauer's dissents.

"In our own state a hearing was held before the Senate Committee on Judiciary on March 9, 1960. That hearing was telecast in its entirety and was subsequently released as a printed report.

"During that hearing a report from the Los Angeles Police Department entitled, 'Employees Report, Robbery Suspects in Committing Capital Offenses' was introduced. That report showed that a number of defendants in conversations with reporting officers stated that they either had (1) toy guns, (2) empty guns, or (3) simulated guns, rather than taking a chance on getting the gas chamber.

"Likewise the Sheriff of Los Angeles County, Mr. Pitchess, in his presentation referred to specific instances where suspects had admitted that they had not armed themselves for fear of the death penalty. Likewise a tape was played to the committee in which a suspect had stated that a crime committed by him had been with a gun from which the firing pin had been removed so that no one would be injured, because he did not want to get the gas chamber (Report of the Senate Committee on Judiciary, March 9, 1960, pp. 149-153).

"Likewise Mr. Coakley, the District Attorney of Alameda County, informed the committee that any chief of police or sheriff or district attorney in any large community has had the same experience of talking to robbers who had told them they used a gun which was inoperative because of fear

of the death penalty (Report of the Senate Committee on Judiciary, March 9, 1960, p. 156).

"Testimony to the same effect was elicited from Chief of Police Parker of Los Angeles (Report of the Senate Committee on Judiciary, March 9, 1960, p. 161).

"In an article appearing in 35 State Bar of California Journal one of the outstanding defense attorneys of the State, Mr. Leo R. Friedman, stated:

" 'The foregoing claims (that capital punishment was not a deterrent) cannot be reconciled with the numerous cases of robbery, bank stick-ups, burglaries, etc., where the criminal used an unloaded gun or a toy pistol. Such criminals were willing to take a chance on being caught and imprisoned, but would not take a chance on killing the victim and being executed.

" 'Naturally, there can be no statistics produced to demonstrate how many murders were *not committed because the would-be perpetrator feared the death penalty.* If but one or two innocent lives are saved each year because the death penalty has deterred the commission of a murder, then the death penalty is justified. No one can successfully deny that the fear of the death penalty has saved innocent lives.'

"The numerous specific instances are all part of the history of this State and they show that among the professional criminals capital punishment is a deterrent and because of it, he commits crimes armed with a toy or inoperative gun. Thus it was proper for the district attorney to so argue to the jury."

For all the reasons stated in our dissents to the majority decision and for the further reasons so ably presented for the People by the Attorney General, the petition for rehearing should be granted.

GIBSON, C. J., TRAYNOR, J., PETERS, J., WHITE, J., and DOOLING, J.—The dissenting opinion to the order denying rehearing requires this response.

We held in this case that it was prejudicial error for the prosecutor in a murder case to assert that the death penalty is a more effective deterrent than life imprisonment when there was no evidence to that effect in the record and to bolster that assertion with statements of fact of which there was likewise no evidence in the record.

The wisdom and deterrent effect of the death penalty are for the Legislature to determine, and are therefore not justici-

able issues. Hence our holding that evidence thereon was inadmissible. Juries in capital cases are not legislatures *ad hoc* and trials on the issue of penalty are not to be converted into legislative hearings. Were it otherwise, counsel for both sides could prolong as well as confuse the trial on the issue of penalty with a tangle of conflicting evidence on the vigorously disputed proposition that the death penalty is a more effective deterrent than life imprisonment. Even the dissenters agree that ''certainly the . . . holding is correct'' that the ''wisdom or deterrent effect of [the penalties of first degree murder] are for the Legislature to determine and are therefore not justiciable issues. Hence evidence as to these matters is inadmissible.''

The People argue that ''it is proper to advise a jury of the effect of the various penalties between which they must choose, for only if such is done can the jury arrive at an intelligent determination of which penalty to impose.'' In support of this argument cases are cited holding that it is proper to inform the jury of the minimum term that a person given a life sentence for first degree murder may serve.

What the petition for rehearing fails to recognize is that the basis of the argument permitted on the minimum term that may be served on a life sentence is the introduction of evidence to support such argument. Once we concluded that evidence of the comparative deterrent effect of the respective sentences was not admissible, it necessarily followed that argument on the subject would not be proper unless we could say as a matter of common knowledge that the death penalty is the more effective deterrent. We could not so conclude when it is common knowledge instead that there is vigorous dispute whether capital punishment is a more effective deterrent than life imprisonment.

Thus ''Whether or not the death penalty more effectively deters the crime of murder than would any other punishment is the most hotly debated question within the capital punishment policy issue.'' (Ohio Legislative Service Commission, Capital Punishment, Staff Research Report No. 46, January, 1961, p. 31.) This conclusion is documented in numerous studies by penologists, criminologists, legislative committees, and others. (See, for example, Report of the Royal Commission on Capital Punishment 1949-1953; Report of California Senate Committee on Judiciary March 9, 1960; Assembly Interim Committee Reports, 1955-1957, Report of Subcommittee of the Judiciary Committee on Capital Punishment

Pertaining to the Problems of the Death Penalty and Its Administration in California; Thorsten Sellin, The Death Penalty—A Report for the Model Penal Project of the American Law Institute (1959); Sir Ernest Gowers (Chairman of the Royal Commission on Capital Punishment), A Life for a Life (1956); Bennett (Director of Bureau of Prisons, U.S. Department of Justice), *Delaware Abolishes Capital Punishment,* 44 ABAJ 1053; Gardner (Chairman of the General Council of the Bar of England and Wales), *Capital Punishment in Britain,* 45 ABAJ 259; Savitz, *A Study in Capital Punishment,* 49 Journal of Criminal Law, Criminology and Police Science 338; George Ryley Scott, *The History of Capital Punishment* (1951); E. Roy Calvert, Capital Punishment in the Twentieth Century (1927); Capital Punishment (1961), the National Council, Episcopal Church; Zilborg, The Psychology of the Criminal Act and Punishment (1954); Ball, *The Deterrence Concept in Criminology and Law,* 46 J. Crim. L., C. & P. S. 347, 353-354; *The Deterrent Influence of the Death Penalty in Murder and the Penalty of Death,* 284 The Annals of the American Academy of Political and Social Science, p. 62; Morris, *Thoughts on Capital Punishment,* 35 Wash. L. Rev. 335.)

The Legislature has taken care not to express a preference for one penalty or the other. Instead it has left to the absolute discretion of the jury the fixing of the punishment for first degree murder. It bears noting that reasons other than deterrence have been advanced in support of the death penalty, such as retribution, and the protection of society from further harm from the defendant. It is a far-fetched speculation that the Legislature, by leaving it to the jury to impose one penalty or the other, has indicated that the death penalty is a more effective deterrent than life imprisonment.

It is a baseless fear that the preclusion of arguments to the jury on a question they cannot properly evaluate without evidence will encourage murders in the commission of crimes of violence. The Penal Code provides for the death penalty. A criminal will hardly be emboldened to take a risk so grave because of a ruling that neither the defendant nor the prosecutor can introduce evidence or argue to the jury that one or the other of the penalties prescribed is the more effective deterrent.