[Crim. No. 5189.    Second Dist., Div. Three.    Nov. 19, 1954.]

THE PEOPLE, Respondent, v. JAMES RUSSELL TRAVIS, Appellant.

Eleanor V. Jackson for Appellant.

Edmund G. Brown, Attorney General, and James D. Loebl, Deputy Attorney General, for Respondent.

SHINN, P. J.—James T. Prewitt and defendant and appellant James Russell Travis were charged with two counts of robbery and one count of burglary. It was also alleged that at the time of the commission of the offenses defendants were armed with pistols. Defendant Prewitt entered a plea of guilty as charged in Counts I, II and III of the information. He admitted being armed as to Counts I and II and denied being armed as to Count III. The court found the crime as to Counts I and II as to defendant Prewitt to be first degree robbery and found the crime as to Count III as to defendant Prewitt to be second degree burglary. The allegation of being armed as to Count III was, on motion of the district attorney, stricken as to defendant Prewitt. Travis admitted a prior conviction which was alleged in the information. He was found guilty on Counts I and II of robbery in the first degree and guilty on Count III or burglary in the second degree. The jury also found that the allegations in Counts I and II that defendant Travis was armed were true and that in Count III the allegation that defendant Travis was armed was not true. Motion of defendant Travis for a new trial was denied. Execution of

the sentence as to each count was suspended and defendant Travis was referred to the California Youth Authority. The California Youth Authority having accepted the case, defendant was committed to said Authority for the term prescribed by law as to Counts I, II and III of the information. Defendant Travis appeals.

In the early morning of August 6, 1953, John C. Beckland was at the corner of Seventh and Berendo Streets in Los Angeles. At about 2:55 a. m., a green 1950 Oldsmobile 88 with two men in it drove up. A man, later identified as codefendant Prewitt, who was sitting on the passenger's side of the front seat, thrust a gun out the window, which Beckland identified as an automatic with a blue steel finish, and ordered him to throw his billfold into the street. Although he only got a look at the driver's profile, Beckland could tell he was a white man, with dark hair and sideburns. Beckland complied with the request of the two men after first asking if they would leave him enough money for taxi fare. After he threw the billfold into the street, he was ordered to turn around and walk toward a building. Shortly thereafter he hurried back to the spot and found the wallet with $1.00 remaining instead of the original $46.

On the morning of August 5, 1953, Abe Shapiro was waiting at the southeast corner of Larchmont and Beverly for a bus to take him to work. At approximately 5:05 a. m., a gray 1946 Plymouth or De Soto drove up to the curb and one of the two men seated in the car asked him to come over. Shapiro looked into the car and saw that each of the two men had a gun in his hand, both of which he identified as blue steel automatics. The passenger, whom Shapiro later identified as codefendant Prewitt, ordered him to hand over his wallet, which he did. The wallet contained $27 or $28. Two guns were introduced into evidence, a .32 caliber and a .38 caliber automatic. The larger gun was identified by Shapiro as that held by the driver of the car and the smaller as that held by the passenger identified as codefendant Prewitt. Although Shapiro testified that the driver was a young white man with dark hair, he could not identify defendant Travis as that man.

Ronald Earl Allen, who delivers Examiner newspapers in Burbank, was waiting outside the office for it to open on the morning of August 4, 1953. At 3:50 a. m., a car went by very slowly and parked around the corner. Two men got out and walked up to the window of the American

Weapons Corporation and threw a rock through it. One of the men went inside. At this point Mr. Allen drove his motor scooter a couple of blocks away and telephoned the police. When he returned, the men and their car were gone. Mr. Allen identified the men as white, and believed one was three or four inches taller than the other.

Joseph L. Bickston, manager of the American Weapons Corporation in Burbank, returned to the store on the morning of August 4, 1953, and discovered that it had been broken into. After checking the inventory it was determined that two Colt automatic pistols had been taken. One was a .32 caliber, with serial number 448044, and the other a .38 caliber with serial number 50808. These serial numbers are identical with those found in Exhibits 1 and 2.

Kenneth H. Knowles was the Deputy Sheriff of Los Angeles County who arrested defendant Travis on August 7, 1953, as he was coming out of his hotel room. A Colt automatic with serial number 448044, which is Exhibit 1, two butcher knives and a cleaver were found under one of the two mattresses which covered a double bed in the room of defendant Travis at the West Hollywood Hotel. Travis was present at the time.

Walter H. Pease, another of the arresting officers, drove with the defendant from his hotel room to the Hollywood sheriff's substation. Pease testified that statements made by Travis were made freely and voluntarily without promise of reward or immunity, and that Travis stated that the gun belonged to him, and Prewitt also had a gun; that when he left the hotel in the morning the two guns were under the mattress; that when he returned one was missing.

Walter O. Reynolds, another deputy sheriff, questioned defendant Travis on August 7, 1953. He testified that Travis admitted the holdup at Beverly and Larchmont in which he and Prewitt received $26 or $27. He also admittted the holdup at Seventh near Catalina, in which the victim had asked to be left cab fare, and they left him $1.00. He also admitted that he and Prewitt got the guns by breaking into a sporting goods store in Burbank. This conversation took place before Prewitt had been arrested. Both Prewitt and Travis signed written confessions in which they admitted having committed the three offenses charged.

Codefendant James T. Prewitt testified for the defense that on August 8, 1953, the morning after he had been arrested he had talked with Travis and Travis had told him

to say that he (Travis) had accompanied him on each of these three crimes. It was for this reason alone that he told the police that Travis was with him. He testified that this was not true and that a man named Shades had accompanied him.

Defendant Travis testified that he shared Prewitt's room with him from the latter part of July; that during the times in question he had been with his girl friend Dolly Johnson, and had not accompanied Prewitt; that the confession which he made in the sheriff's substation was involuntary and induced by a slap which he claimed Officer Reynolds gave him and threats made by the officer; that he was sitting with his hand on his knee and that Reynolds slapped his wrist, knocking his hand off his knee. Travis admitted that he had told Prewitt to tell the officers that Travis and Prewitt had committed the crimes, but denied that he did actually accompany Prewitt or participate in the crimes. His explanation of his confession and his telling Prewitt not to deny that he had taken part in the crimes was that he was then on parole, that he knew his parole would be revoked and that his confessing further crimes would make no difference.

Dolly Johnson testified that at the time Beckland was robbed Travis was at her home with herself and her brother.

Defendant makes the following points on appeal: (1) the trial court's conduct was prejudicial to appellant; (2) the prosecutor's unrebuked use of the term "rat pack" was prejudicial to the appellant; (3) the court erred in refusing an instruction requested by defendant.

When defendant's confession was offered in evidence defense counsel asked leave to approach the bench to register an objection. The court ruled that it should be made from the counsel table. After a considerable colloquy it developed that one of the grounds of objection was that the confession related to matters of a prejudicial nature which were outside the issues. When this ground of objection was stated the court gave it due consideration and ordered excluded the portions the court deemed objectionable. The incident would not have occurred had counsel stated the reason for desiring to present her objection out of the hearing of the jury.

In a cross-examination of the witness Beckland, he was questioned as follows:

"Q. As a matter of fact, Mr. Beckland, you never saw, that is recognized, this man Travis who is in the courtroom here as anyone you had ever seen before prior to August

18th, 1953, isn't that correct? A. That is correct, and I still can't recognize him. That's the reason that during the first trial I did not tell people I could recognize him.

"Q. As a matter of fact, this is the first occasion, Mr. Beckland, is it, you have spoken even of sideburns?

"THE COURT: Just a moment, I couldn't hear a word you said. May I have it, Mr. Reporter?

"(Question read by the reporter.)

"THE COURT: Objection sustained to the question. There is nothing to show he ever was asked about sideburns.

"MISS JACKSON: The witness has already testified that he did mention——

"THE COURT: My dear Madam, every time I make a ruling you persist in arguing. Let me tell you definitely you cannot impeach a witness by calling his attention to failing to testify to something on a former occasion unless you first establish he was asked about it. That is the reason witnesses are not allowed to volunteer testimony. Unless there was a question asked with reference to sideburns you can't use it at this trial.

MISS JACKSON: I have no further questions."

During defense counsel's argument to the jury she started to read from the court's opinion in *People* v. *Simmons*, 28 Cal.2d 699 [172 P.2d 18]. She was interrupted by the statement of the court:

"Pardon me, I'm not going to permit the reading from any book which is not in evidence. That's elementary.

"MISS JACKSON: Very well, your Honor.

"THE COURT: The jury has to decide these cases upon the evidence before them, not upon what somebody has written in the form of a textbook or particularly a judicial decision.

"MISS JACKSON: A point that I was going to make, and unfortunately Justice Carter has expressed it much better than I could, but I will try to rephrase his words."

Apparently counsel was intending to discuss the unreliability of confessions made under pressure. She referred to the cases of Cardinal Mindszenty, William Oatis and Robert Vogeler, as follows:

". . . after the last trial this was particularly brought home to me. In that trial I argued one has only to think of the recent trials behind the iron curtain countries of Cardinal Mindszenty, William Oatis, and Robert Vogeler— both Vogeler and Oatis came back to the United States. They told us that wasn't the truth, what they confessed to was not

the truth—and these are men whom we regard with the highest—as people with the highest degree of intelligence, and yet under certain conditions they confessed to things that were not true. Now, it was after the last trial that I opened Time Magazine, the November 9th issue, there was a whole page——

"THE COURT: Pardon me, I just stopped you a moment ago. We do not permit in our courts the introduction in argument of things that appear in magazines, newspapers, books and so forth.

"MISS JACKSON: I'm not introducing this in evidence now, your Honor, I'm only referring to it.

"THE COURT: I'm not going to permit anything of that sort to be demonstrated, handed out, and displayed to the jury, or read to the jury. You started out to do it and I stopped you. Very distinctly, that is not permitted. We can produce all sorts of books in here which might be very misleading and very inaccurate. We have no guarantee as to the accuracy, particularly of magazine or newspaper accounts. You may proceed.

"MISS JACKSON: Ladies and gentlemen, I have no desire to mislead you. I wish to remind you and make you think of the things which you know in your own experience exist and you know in your own experience that our own members of the armed forces, lieutenants, captains and corporals and privates, have come back from Korea where they had been prisoners of war, and they have told us while they were over there they confessed——

"THE COURT: Pardon me, is this in evidence? You've got to limit yourself to the evidence. You can't go and discuss matters you may have read somewhere, without any authority or proof of the matter. Limit yourself to the evidence in this case.

"MISS JACKSON: Your Honor, this is only by way of argument with regard to the kind of confessions which people make which are not true.

"THE COURT: That is the second or third or fourth hearsay, that's not receivable as part of our trial procedure here. We have to decide these cases upon the facts in a particular case, not on what some newspaper reporter at some time has written. I respect the press, but I can't decide a case nor can the jury decide cases upon what somebody has published in a newspaper or magazine. You may proceed.

"MISS JACKSON: In that particular, ladies and gentlemen

of the jury, it's not my intention to underwrite what is written in the press or to say that everything that is written in the press is true, because I know better . . .''

■ The rulings mentioned above are to us inexplicable. The witness Beckland had previously given such description of the driver of the car as he recalled. The question "As a matter of fact, this is the first occasion, Mr. Beckland, is it, you have spoken even of sideburns?'' was proper cross-examination. It was obviously an attempt to show that the witness had added something to his former description and not an attempt to show a former contradictory statement. However, the witness did not identify the defendant and we think the ruling was not prejudicial.

The following matters are considered under the assignment of misconduct on the part of the court. The court said of the question asked Beckland: ''Objection sustained to the question.'' There had been no objection by the People. The court ruled out the question in a summary manner and would not allow defense counsel to be heard as to the propriety of the question stating: ''My dear Madam, every time I make a ruling you persist in arguing.'' The record shows that up to this time counsel had not argued with the court or made comment upon a ruling in a single instance. She was reproved by the court when she attempted to point out that it was a proper question. There is no suggestion in the record that her manner was not respectful, yet she was not even allowed to finish the sentence which she started. She had a right to state her position in view of the peremptory ruling by the court on its own objection, although if she had been afforded an opportunity to be heard before the ruling, the court could properly have refused to listen to any complaint or criticism of it. ■ It is not only the privilege but the duty of an attorney to speak up at a proper time and in a proper manner in an effort to forestall rulings by the court which he considers erroneous and detrimental to his case, or, in other words, to argue with a judge in the interests of his client. ■ And when pertinent argument is presented in a proper manner it is the duty of the court to listen.

When counsel was not permitted to read from the opinion of Justice Carter in the *Simmons* case, the court made no inquiry as to the portions which counsel wished to read. We have read the opinion of Justice Carter. It contains an admirable discussion of the law relating to accusatory state-

ments and admissions of an accused while in custody. It also contains much that could properly have been excluded by the court as irrelevant. The record does not show what portions counsel intended to read or what portions the court anticipated she might read. The objection, therefore, cannot be sustained on the ground that counsel proposed to read something which would have been improper for the jury to hear. The rulings of the court confused argument with evidence. ■ The ground of the rulings was that in the course of argument to a jury counsel in the case may recount or read nothing that has not been received in evidence. This concept of what is proper by way of argument is contrary to well-recognized privileges and practices of the profession as old as the law itself. If argument is to be so restricted, there could be no use made of the writings of philosophers, patriots, statesmen or judges. For those classical expressions of truths which have influenced the thoughts of men for inept composition. No longer would he enjoy the traditional ages, the lawyer would be left to his own dull and perhaps privilege of employing in argument the words of great men, past or present, unless he had successfully adopted the unheard of procedure of offering them in evidence. ■ There can be no doubt as to the right of an attorney to argue in any manner he considers to be most effective. Of course, he may expect to be corrected by the court if he oversteps his privileges by misstating the evidence, by stating factual matters to the jury that are not in evidence, or failing to maintain a proper courtroom demeanor. He is not subject to criticism or reproof because his argument may appear to the court to be illogical, unreasonable or irrelevant. He may not be refused the right to read by way of argument from the writings of others for the reason, forsooth, that they have not been offered and received as evidence.

In *People* v. *Molina,* 126 Cal. 505, 508 [59 P. 34], the court said: ''In the leading case of *Tucker* v. *Henniker,* 41 N.H. [317] 323, it is said: 'The right of discussing the merits of the cause, both as to the law and facts, is unabridged. The range of discussion is wide. He may be heard in argument upon every question of law. In his addresses to the jury it is his privilege to descant upon the facts proved or admitted in the pleadings; to arraign the conduct of parties; impugn, excuse, justify, or condemn motives, as far as they are developed in the evidence; assail the credibility of witnesses, when it is impeached by direct evidence, or by the

inconsistency or incoherence of their testimony, their manner of testifying, their appearance on the stand, or by circumstances. His illustrations may be as various as the resources of his genius; his argumentation as full and profound as his learning can make it; and he may, if he will, give play to his wit, or wings to his imagination.' ''

It has been our experience that trial courts give generous recognition to this rule of procedure.

The rulings of the court with reference to examples of forced confessions of prisoners present the question whether argument to juries is subject to general censorship by the court such as would bar reference to matters of common knowledge and of historical significance. Every person of common intelligence possessed of superficial information as to what has been going on in the world has heard and probably shares the common belief that confessions and untruths have been uttered under compulsion by our servicemen and other citizens while they were held as prisoners in foreign lands. There is a parallel in principle between such confessions and the confession of a youth which he claims was obtained from him by rough treatment and threats by the police. The trial court excluded reference to the experiences of servicemen and other citizens and of their claimed false confessions for the reason that there was no evidence or proof that such false confessions had been made, and that statements concerning them were "second or third or fourth hearsay." If this would be a ground for excluding a statement offered, not as evidence, but purely as argument, then most of the matters that are of common knowledge would be subject to exclusion as hearsay.

In *Molina, supra,* the court quoted as follows: "In Bishop's New Criminal Procedure, volume 1, section 975a, it is said: 'Matters of common knowledge—being things not special to the case in hearing—may, like the language itself, be parcel of the woven argument which the advocate lays before the jury.' '' In *People* v. *Kynette,* 15 Cal.2d 731, 757 [104 P.2d 794], it was said: "Counsel may illuminate his argument by illustrations which may be as various as the resources of his talents. He may refer to matters of common knowledge, not special to the case, and to well known historical incidents. (*People* v. *Molina,* 126 Cal. 505, 507 [59 P. 34]; 8 Cal.Jur. 272, sec. 333.) ''

██ We think that the manner in which defendant's counsel was restricted and reproved during the course of

her argument tended to picture her as a person ignorant of the law and the proprieties of courtroom procedure. (We note that the court did not interrupt the deputy district attorney when he described to the jury the manner in which windows are washed in India and delivered a eulogy of Cardinal Mindszenty.) Ordinarily, the effect would be to render less effective counsel's argument to the jury. But however embarrassing the court's interruptions and censorship of counsel's argument may have been, we cannot see that any real prejudice resulted to the case of the defendant. There was nothing in the court's rulings or remarks which reflected upon the merits of the defense that was offered. Criticism of counsel's argument related to matters entirely apart from the facts of the case. There was no restriction of argument based upon the evidence. Although the rulings complained of were clearly erroneous, the charge of *prejudicial* conduct is not sustained.

■ The deputy district attorney referred to the "perpetrators of this crime" as members of a "rat pack." This is an expression currently used with great frequency by the local press as descriptive of gangs of youths that have brought about an era of violence and crime in our community. Defense counsel interrupted to protest the use of the term and presumably to request that the jury be instructed to disregard it. She was interrupted by the district attorney who insisted that "rat pack" was a fair designation. The court remarked: "You may proceed." Such name-calling is improper. It detracts from the dignity of the high office of district attorney. If tolerated by the court the use of such invectives may and often does lead to prejudicial misconduct. It should have the disapproval rather than the tacit approval of the court.

■ We are unable to see that the matters of which defendant complains resulted in a miscarriage of justice. It is unnecessary to summarize the evidence indicative of defendant's guilt. In view of that evidence and of defendant's confession for which he offered no satisfactory explanation, we are of the opinion that a conviction would probably have resulted in the absence of incidents of which defendant complains.

■ Defendant requested and the court refused an instruction to the effect that unless the jury should find that the crimes charged had been committed by someone, defendant could not be convicted solely by evidence of his con-

fession or admissions. Defendant does not question the sufficiency of the proof of the corpus delicti. It was not error to refuse the instruction.

The judgment and order denying a new trial are affirmed.

Wood (Parker), J., and Vallée, J., concurred.

A petition for a rehearing was denied November 30, 1954.