[Crim. No. 3579. Third Dist. Dec. 2, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. THOMAS CALVIN WOODSON, Defendant and Appellant.

Andrew J. Hollis, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Doris H. Maier, Assistant Attorney General, Edsel W. Haws and Richard K. Turner, Deputy Attorneys General, for Plaintiff and Respondent.

PIERCE, P. J.—Defendant was convicted of two counts of burglary and of two counts of assault. Of his several contentions on appeal we deem one—that the trial court erred in refusing to permit his counsel during argument to refer

to a news story illustrative of his argument that convictions based on mistaken identity are common—to be well taken. We hold, however, that this error was without prejudicial effect.

The charges against defendant arose from two separate episodes on successive nights. On the night of July 28-29, 1963, in the early morning hours, Louis Laine, 82 years of age, residing at 2692 Greenville Street, Oroville, awakened and noticed that a light was on in the kitchen of his home. Immediately thereafter an intruder, a Negro, came into his bedroom and approached Laine's bed. The burglar's arms were stretched forward at shoulder height and he was holding a cloth which appeared to be a curtain in his clenched fists. As he came closer Laine kicked out, pushed his assailant against the wall and tried to get out of bed. The man struck him in the face, bruising his eye severely. Laine called out, warning his wife there was a man in the house. Mrs. Laine came out of her bedroom. The burglar picked up a pair of Laine's shoes and ran from the house.

Laine testified that the man's face was not covered; that his room was indirectly but well illuminated from the kitchen lights (which the burglar had himself turned on); and that the man's facial features were clearly visible. He positively identified the defendant as the man who had attacked him. Cross-examined, he admitted that he had been unwilling to identify the defendant in a police lineup a day or so after the incident but gave as the reason that at the time he was still in a "state of emotional shock." (It appeared from his and his wife's testimony that Laine suffered from a heart condition and "is a very badly crippled and very sick man. . . .") Mrs. Laine also positively identified the defendant. She testified the man had appeared surprised when he discovered that her husband was not alone in the house. She said: "[A]nd when he saw me he stood stiff and stared at me. . . ." She also testified as follows: "Q. Did you get a good look at him at that time? A. Yes, sir, I did. I will never forget him." Mrs. Laine had also identified defendant in the police lineup.

The shoes which had been taken were found, one in the yard of a woman residing across the street and one house removed from the house where defendant resided with his family, the other, by a minister in the yard of his home at 2819 Greenville Street, a block from the Laine residence and two doors from the Woodson home.

On the next night (July 29-30) at midnight, or shortly before, a burglar visited Norma Cartwright and her children at their home at 2363 "D" Street. (This is in the same neighborhood as the Laine and Woodson residences.) Mrs. Cartwright awoke and "sensed that somebody was in . . . [her] bedroom. . . ." She saw a man standing by her bedroom door. She had a pistol under her pillow and threatened to shoot but was told, "If you have a gun under that pillow so help me God I will kill you." The man then said, "Don't scream, all I want is your money." He took hold of her arm. She noticed from his arm on hers and when his hair brushed her cheek that he was a Negro. The man pulled her toward her children's room, but she was able to break away and ran from the house screaming. Remembering that her children were alone in the house with the burglar, she stopped about 15 to 16 feet away and turned. The man turned the front porch light on, then off; he then turned the living room light on, then off. In this light she saw the man's profile and saw that he was a carrying a pistol. (Hers was missing when she returned to the house.) The man walked around the corner of the house and she lost sight of him.

A neighbor, John Vandevier, heard Mrs. Cartwright's screams. He opened the door leading into his yard. Asked to describe what he had seen he testified: "Well, first of all off to the right I heard a person running, and then this person stopped right in front of the door with the light going out over my shoulder and striking him in the face and he had a pistol in his right hand and to the best of my knowledge the exact words he told me was, 'Don't move, man, don't move.' " He added that the man, who was standing 12 to 15 feet away from him, then pointed the gun at him, stood there for 30 or 40 seconds and then ran away. Vandevier identified defendant in the courtroom as the man who had held him up. He had also identified defendant's photograph among "mugshots" at the police station. Further identification was made by Vandevier of defendant in a lineup.

Mrs. Cartwright had also identified defendant's profile photograph at the police station among a number of "mugshots" of colored men. She also picked him out in the lineup. On the same occasion, with the persons concealed from her, she was able to identify defendant's voice from others instructed to speak softly using the same language as that in the warning which her intruder had spoken on the night of the burglary.

Defendant testified on his own behalf. His defense was an alibi. He said that on the night of July 28-29 he had gone to a movie, had left the movie at 10 and had gone to a place called the Cotton Club where he had been with friends until about 2 a.m. Four of his friends, named by defendant, had taken him home where he remained the rest of the night. (These friends were not produced as corroborating witnesses nor was his account of his activities the first night otherwise corroborated.)

Defendant's alibi for the following night (July 29-30) was that he had remained at home all evening and all night. He said he played "Monopoly" with a brother in the evening. Of the household consisting of nine, including his father, his mother, his sister, two younger brothers (with whom he occupied the same bedroom) and his brother-in-law, only his mother was called to corroborate his testimony. She testified: "Q. Did Tom stay home all that evening? A. Yes, he did." No particularization was given. This was her only testimony on this point. (It had been brought out during defendant's cross-examination that ingress and egress to and from his bedroom was through a back door and a hall.)

Defendant showed that he held a steady job and contributed to the family household expenses. He also produced evidence that while he had been in custody the police had investigated a complaint that an attempted rape had been committed by a Negro in the neighborhood.

Before discussing the complained of error, mentioned above, which gives us concern, we will consider defendant's other contentions. The first relates to asserted misconduct by the district attorney in his argument to the jury. In that argument the prosecutor told the jury he thought it owed it to the defendant and his family "to give this young man who has a future if he is straightened out, to get this young man straightened out." The argument was to the effect that defendant lacked discipline, self-control and respect for law and needed guidance; rehabilitation. Defendant argues that the jury would have inferred from this that if convicted defendant would be granted probation, and that it was therefore an improper exhortation to the jury to consider the penalty phase of the trial. (Witkin, Cal. Criminal Procedure (1963) § 456, p. 459.) We do not so regard the argument. The jury was merely being told that if it found the defendant guilty it would not be serving his own best interests to acquit him out of sympathetic regard for his youth. (Defendant was

19 years of age.) ▌ Moreover, assuming impropriety, there was no objection made (see *People* v. *Lyons*, 50 Cal.2d 245, 262 [324 P.2d 556]), and the "misconduct," if any, was neither gross nor irreparable. The jury was correctly and fully instructed (and elsewhere advised by the district attorney in argument) that it was not to concern itself with what punishment would be meted out for the offenses committed— that not being its responsibility or function.

▌ Defendant produced two witnesses, his mother and a brother, as character witnesses. They testified to his good reputation for truth and veracity. On rebuttal the district attorney called Captain Stenberg of the Butte County Sheriff's office. After considerable colloquy (all of it outside the jury's presence) and thereafter some imprecision in the framing of questions, the witness was properly asked if he had knowledge of the reputation of defendant for truth and veracity, answered that he did. On cross-examination he answered negatively a question whether he had heard someone say, "Tom Woodson is a liar." On redirect he was then asked: "[H]ave you ever heard people indicate that he does not tell the truth, or that his reputation for truth and veracity is not good?" and he answered: "Yes." A second rebuttal witness, Sergeant Wood, was called and the questioning of this witness was also inexact. Objections were sustained to these questions and the witness was excused without it having been established that he knew the defendant's general reputation in the community for truth and veracity and without having testified thereto. The prosecutor's questioning departed from the highly stylized methods which have been held permissible in this field (see Witkin, Cal. Evidence, §§ 651, 654; and see Dean Wigmore's comment critical of "reputation" evidence, 7 Wigmore, Evidence (3d ed.) § 1986, p. 167), but we cannot perceive any possible prejudice to defendant.

▌ We now consider the contention on appeal stated in the first paragraph of this opinion. Defendant's attorney during the course of his argument adverted to an article which he had read in an Oroville newspaper in its issue of December 17, 1963. The article referred to a pardon by Governor Brown of a person who was shown to have been convicted of three robberies later established to have been committed by another man. When he started to read it an objection was made by the district attorney which was sustained.

In our view, the attorney should have been permitted to

refer to this as a part of legitimate argument that instances of convictions on the basis of mistaken identity are common.[1]

In *People* v. *Love*, 56 Cal.2d 720 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809], the Supreme Court (per Justice Traynor) at page 730, in discussing the extent of tolerance of counsel's summation to the jury, says that it " 'must be based solely upon those matters of fact of which evidence has already been introduced or of which no evidence need ever be introduced because of their notoriety as judicially noticed facts.' (6 Wigmore, Evidence (3d ed. 1940) § 1806, p. 259. . . .) *He may state matters not in evidence that are common knowledge, or are illustrations drawn from common experience, history, or literature.''* (Italics supplied.)

Justice Traynor cites, *inter alia,* in support of the statement we have italicized *People* v. *Travis,* 129 Cal.App. 2d 29, 37-39 [276 P.2d 193]. That was a case in which the trial court had curtailed in a most peremptory manner the right of defendant's attorney to cite illustrations of the unreliability of confessions made under pressure. She had tried to discuss the confession of Cardinal Mindszenty and others, and had proposed to read from a current issue of Time Magazine. The appellate court, in *Travis, supra* (per Presiding Justice Shinn), deploring the trial court's ruling, noted (on p. 37) that it had "confused argument with evidence. The ground of the rulings was that in the course of argument to a jury counsel in the case may recount or read nothing that has not been received in evidence. This concept of what is proper by way of argument is contrary to well-recognized privileges and practices of the profession as old as the law itself. If argument is to be so restricted, there could be no use made of the writings of philosophers, patriots, statesmen or judges. . . .''[2]

Respondent has cited two cases, *People* v. *Hawthorne,* 75 Cal.App. 657 [243 P. 64] and *People* v. *Radovich,* 125 Cal. App. 77 [13 P.2d 860], as asserting more restricted rules regarding the scope of defense counsel's argument. While we are always deferential to the precedents of, and views expressed by, other District Courts of Appeal, we cannot reconcile these decisions with the statement quoted above from *People* v. *Love, supra,* by which we are willingly bound

[1]For a collection of a number of such instances see Radin, The Innocents; Borchard, Convicting the Innocent.

[2]The foregoing will suffice as our quotation from the opinion. The entire comment of Justice Shinn on pages 37-39 is commended as an accurate statement of the extent and limits of the latitude to be given a defendant's attorney in argument.

and which cites with aproval *People* v. *Travis, supra,* the reasoning of which we endorse.

█ To be noted in connection with this point made by defendant on appeal is his further and last contention. Dur-the argument of defendant's attorney he referred to the possibility of mistaken identity and stated "my hope is that your decision will be one that . . . [hereafter] you can say to yourself, 'I made the right decision,' and have no fear that some day someone will turn up that is the right man." The district attorney interrupted the argument, objecting to the statement on the ground "there is no evidence of anyone else being involved in this matter. . . ." The argument by defense counsel was proper; interruption by the prosecuting attorney was improper, his objection unsound. *However, the court promptly overruled the objection;* there was no motion to strike the prosecutor's statement; and the court fully and correctly instructed the jury regarding alibi evidence[3] and also told it that it was not to regard counsel's statements as evidence.

█ Although defense counsel should have been permitted to give the excluded illustration regarding the incidence of mistaken identity and the prosecutor's interruption of counsel's argument was improper the charge of *prejudicial* error and misconduct cannot be sustained.

The jury, as stated above, had been clearly instructed regarding an alibi (see fn. 3). There was no contention the prosecution witnesses were not telling the truth. Mr. Laine and Mrs. Cartwright had obviously each been attacked and their homes burglarized by someone. The question was whether they had mistaken the identity of the guilty person. That, bolstered by his alibi, was defendant's sole defense. The jury could not have been misled by the prosecutor's equivocal statement that "there is no evidence of anyone else being involved in this matter." As regards the curtailment of defense

---

[3]The court instructed the jury as follows: "When one who was not at the place where a crime was committed at the time of its commission is later accused with having been present and having committed or taken part in committing such crime, his physical absence from the scene of the crime or his lack of participation therein, if proved, is a complete defense that we call an alibi."

"The defendant in this case has introduced evidence tending to show that he did not participate in and was not present at the time and place of the commission of the alleged offenses for which he is here on trial. If, after a consideration of all the evidence in this case, you have a reasonable doubt that the defendant was present at the time the crime was committed and that he participated in the alleged crime, he is entitled to an acquittal."

counsel's argument, he was allowed and exercised full latitude otherwise in trying to convince the jury that the four witnesses who had identified defendant had been mistaken. We cannot agree with defendant that this is a doubtful case. None of the eyewitnesses evidenced recklessness in their identifications. They evinced full awareness of the importance to defendant of their testimony and their obligation for accurate statements. The jury, seeing and hearing these witnesses, found their testimony convincing and the evidence produced by defendant to support his alibi unconvincing. The trial judge denied defendant's motion for a new trial. Our review, limited to the written record, nevertheless leaves us with conviction there has been no miscarriage of justice. (Cal. Const., art. VI, § 4½; *People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243].)

The judgment is affirmed.

Friedman, J., and Van Dyke, J.,* concurred.

---

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.