Filed 2/19/14  P. v. Ramirez CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSE ESTRADA RAMIREZ,<br><br>    Defendant and Appellant. | A134597<br><br><br>(San Mateo County<br>Super. Ct. No. SC072500A) |

A jury convicted appellant Jose Estrada Ramirez of two counts of kidnapping and two counts of rape.  On appeal, he contends (1) the trial court erred by restricting the substance of defense counsel's closing argument, and (2) one of the kidnapping convictions is not supported by substantial evidence.  We agree with appellant's second contention, reverse one of his kidnapping convictions, and otherwise affirm.

**BACKGROUND**

Appellant was charged by information with one count of kidnapping (Pen. Code, § 207, subd. (a)[1]; count 1), one count of kidnapping to commit another crime (§ 209, subd. (b)(1); count 2), and two counts of forcible rape (§ 261, subd. (a)(2); counts 3 & 4) with the special circumstance allegation that appellant kidnapped the victim of the rapes (§ 667.61, subd. (e)(1)).

_____

[1]  All further statutory references are to the Penal Code.

1

The victim, referred to at trial and herein as Maria Doe, testified as follows.[2] Doe and appellant dated for approximately two to three years. Eventually, Doe informed appellant she was ending the relationship. The break up was not mutual.

Shortly after Doe ended the relationship, she went to a party in Redwood City. Appellant came to the party and wanted to talk to Doe. Doe approached appellant as he stood next to a truck and, after a brief conversation, appellant physically forced Doe into the truck. Appellant told the driver, Daniel Moreno, to "take off fast."[3]

In the truck, Doe and appellant argued and he refused to tell her where they were going. He hit her on the mouth and pulled her hair. They drove for about two hours, finally stopping in a secluded, rural location near Pleasanton. The area was wooded with no lights or houses nearby and no other cars on the road. It was approximately 10:00 p.m. and very dark. Appellant and Doe got out of the truck, and appellant told Moreno to leave.

Appellant dragged Doe out of sight of the road, said she was going to pay for what she was doing to him, and raped her. Appellant then called Moreno and, about an hour later, Moreno returned in the truck. Doe got back in the truck because she was afraid of being left alone in the remote area.

Moreno drove them to his house in Palo Alto. During the drive, Doe was bent down in the back seat, crying. In response to her cries, Moreno and appellant laughed and turned up the volume on the music. Appellant told Moreno Doe was paying for what she was doing to him. When they reached Moreno's house, Moreno left the truck and appellant moved to the driver's seat. Doe remained in the back seat and did not try to leave the truck because she was afraid. Appellant told her he would take her back home.

At a certain point, Doe realized they were not on the way to her house. She tried to get out of the truck but appellant prevented her. After several hours in the truck, appellant raped Doe again. Eventually, the truck ran out of gas. Doe asked appellant to

---

[2] Doe testified through an interpreter.

[3] Moreno was prosecuted separately for his role in these events.

2

call an ambulance for her because she was not feeling well. A short time later, emergency personnel arrived and Doe told them what had happened.

Appellant testified at trial, recounting a version of events in which Doe voluntarily accompanied him in the truck and they engaged in consensual sex.[4]

The jury found appellant guilty of kidnapping on count 1. It found appellant not guilty of the charged offense in count 2, kidnapping with the intent to commit another crime, but convicted him of the lesser included charge of kidnapping. The jury also convicted appellant on the rape charges and found true the special circumstance allegations that he kidnapped the victim of the rapes.

The trial court sentenced appellant to consecutive prison terms of 15 years to life on the rape counts. The trial court sentenced appellant to eight years' imprisonment on count 1, but stayed the sentence pursuant to section 667.61, subdivision (f).[5] The trial court sentenced appellant to eight years' imprisonment on count 2, but stayed that sentence pursuant to section 654 because "the [kidnapping] was one continuous course of conduct."[6]

## DISCUSSION

I.     *Defense Counsel's Closing Argument*

Appellant contends the trial court committed reversible error by precluding defense counsel from arguing, during closing statements, about an unrelated news story involving a false accusation. Respondent argues appellant failed to preserve the issue and

---

**4**   Appellant testified through an interpreter.

**5**   Section 667.61, subdivision (f), provides that, where applicable, a circumstance identified in that section "shall be used as the basis for imposing the term provided in [that section], rather than being used to impose the punishment authorized under any other provision of law, unless another provision of law provides for a greater penalty or the punishment under another provision of law can be imposed in addition to the punishment provided by this section."

**6**   The trial court explained: "I don't believe that there was a sufficient break in . . . the situation to constitute a second kidnap. So it is my belief, yes, that from the time [appellant] picked up the victim until the time that the police arrived on scene it was one continuous kidnap."

also contends it is without merit.  We assume, without deciding, the issue is properly preserved, and find no error.

A.    *Background*

During closing argument, defense counsel attacked Doe's credibility by arguing her testimony was not believable; she was testifying against appellant out of jealousy and a desire for revenge over his relationship with his ex-wife; she was testifying to obtain a U visa[7]; and she was not credible because of a prior theft conviction.  Defense counsel highlighted testimony by a peace officer testifying for the prosecution, who "to some degree . . . agreed that many times victims themselves will make false reports of a crime."

Defense counsel then turned to the following:  "In fact, just a few weeks ago, about three weeks ago, in Tamarac, Florida, the father of a three-year-old went to his mother-in-law's home for child visitation.  She shot him, but she called 911 to say that he shot her, and I don't know how many of you saw this in the news or heard about it[.]"  At that point, the prosecutor asked to approach the bench and a sidebar was held.  Although the sidebar was not reported, the prosecutor later put on the record her concern with "the recitation of a specific case that was out of Florida that was in the papers.  It's not within the general knowledge of the public," and the trial court stated it had "agree[d] that it was not permissible, and told [defense counsel] to move on."

After this sidebar, defense counsel continued his closing statement:  "A certain percentage of rape complaints are classified as unfounded by the police and excluded from FBI statistics. [¶] In 1995, eight percent of all forcible rape cases were closed as unfounded as were fifteen percent in 1996 according to FBI reports. [¶] According to the FBI a report should only be considered unfounded when investigations reveal that the elements of the crime are not met or that the report was false. [¶] People do falsely report crimes."

---

**7**    The parties stipulated that a U visa is a temporary visa, granted to allow victims of certain crimes to remain in the United States while their court cases are pending, which may be converted to legal permanent residency after three years.

B.	*Analysis*

We note, as an initial matter, the narrow scope of the claimed error.  A basic description of the Florida incident—including the false accusation ("[s]he shot him, but she called 911 to say that he shot her")—was conveyed to the jury.  The trial court did not strike this portion of defense counsel's closing statement or instruct the jury to disregard it.  Moreover, defense counsel was allowed to make the argument that "[p]eople do falsely report crimes" and to argue statistics regarding false rape accusations.  Appellant's sole complaint on this issue is that defense counsel was not allowed to "finish[] [his] point about the significance of the incident to appellant's case."

"While attorneys may 'state matters not in evidence that are common knowledge, or are illustrations drawn from common experience, history, or literature' [citations], they may not confuse the jury with hearsay in the form of 'irrelevant facts' about 'unrelated specific crimes.'  [Citation.]  '[W]hether a particular newspaper or magazine article should be read to the jury, is a matter that is addressed to the sound discretion of the trial court.'  [Citation.]"  (*People v. London* (1988) 206 Cal.App.3d 896, 909 (*London*).)

In *London*, the defense case involved a theory of mistaken identity.  (*London, supra,* 206 Cal.App.3d at pp. 900-901.)  The trial court refused to allow defense counsel to refer during closing argument to a magazine article reporting a specific instance of mistaken eyewitness identification, but informed counsel he could " 'say that in general, that there are repeated instances [of mistaken identity] in magazines.' "  (*Id.* at p. 909.)  The Court of Appeal found no abuse of discretion:  "In this case it appears that the trial court properly excluded hearsay about a particular, alleged instance of misidentification which had nothing to do with the case before it.  The court did not, however, foreclose all argument about the prevalence of misidentification. . . . To the extent counsel was able to make the argument from common experience, he remained free to do so."  (*Ibid.*)

As in *London*, the trial court permitted appellant's counsel to argue generally about the prevalence of false accusations, and did not strike his description of one such incident.  The trial court could permissibly conclude further discussion of the Florida incident would "confuse the jury with hearsay in the form of 'irrelevant facts' about

5

'unrelated specific crimes.' " (*London, supra,* 206 Cal.App.3d at p. 909; see also *People v. Pelayo* (1999) 69 Cal.App.4th 115, 122 [trial court did not abuse discretion by prohibiting defense counsel from referring during closing argument to newspaper articles about a fabricated accusation].)  The trial court's ruling was not an abuse of discretion.

Appellant relies primarily on *People v. Woodson* (1964) 231 Cal.App.2d 10, 15-16, in which the Court of Appeal held the trial court erred by precluding defense counsel from referring to a newspaper article about the pardon of an individual who had been wrongly convicted.  To the extent *Woodson* and other cases relied on by appellant (*People v. Guzman* (1975) 47 Cal.App.3d 380, 392, criticized on another ground in *People v. McDonald* (1984) 37 Cal.3d 351, 371 & fn. 18; *People v. Travis* (1954) 129 Cal.App.2d 29, 37-38) "reflect particularized exercises of judicial discretion under other circumstances, [they do] not deprive the trial court of discretion in the case before it." (*London, supra,* 206 Cal.App.3d at p. 909.)  To the extent any of these cases hold it is *always* error to prevent defense counsel from discussing specific incidents or cases not in evidence, we decline to follow them.  (See *People v. Marshall* (1996) 13 Cal.4th 799, 854-855 ["trial court retains discretion to . . . ensure that argument does not stray unduly from the mark" and could permissibly conclude "specific and detailed" discussion of the facts of other cases would "draw the jury's focus away from the instant case"]; *People v. Sanders* (1995) 11 Cal.4th 475, 554-555 [trial court did not abuse discretion by refusing to allow defense counsel to discuss "the notorious but unrelated crimes of Charles Manson"].)

II.     *The Second Kidnapping Count*

Appellant argues there was only one kidnapping, and therefore substantial evidence does not support the second kidnapping count.  We agree.

In reviewing a claim that a conviction lacks substantial evidence, we " ' "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' [Citations.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1251.)

" '[T]he forcible detention of the victim is an implied element of the crime of kidnaping and, therefore, as long as the detention continues, the crime continues.' [Citation.]" (*People v. Thomas* (1994) 26 Cal.App.4th 1328, 1335.) Thus, where there is "a single abduction, followed by a continuous period of detention," a single act of kidnapping continues until the victim has been "released from that detention and the danger it presented." (*Ibid.* [reversing second kidnapping conviction]; accord, *People v. Jackson* (1998) 66 Cal.App.4th 182, 189-190.)

In the trial court, neither the information nor the verdict forms identified when or where the kidnapping in count 1 ended and the kidnapping in count 2 began.[8] The only explanation was offered during the prosecutor's closing argument, when she stated count 1 involved "the kidnap that started from Redwood City and ended up in Pleasanton," and count 2 involved "the kidnap that started back from what [Doe] said was Palo Alto dropping [Moreno] off."[9]

On appeal, the People appear to contend the first kidnapping ended either near Pleasanton, when Doe returned to the truck of her own accord, or at Moreno's house, when Doe did not leave the vehicle. Neither theory is supported by substantial evidence.

The People assert that, after the first rape, Doe "returned to the truck on her own" and believed she was being driven home. Contrary to the People's contention, there is no evidence Doe believed she was being driven home at that time. More significantly, as the

---

[8] The jury's confusion on this matter is clear from jury notes asking "when and/or where" counts 1 and 2 began and ended. The trial court's response stated it was "up to [the jury] to determine what the facts are."

[9] The prosecutor explained the rationale behind the second kidnapping count: "Now, you may [be] wondering why is there a different charge? Why is it broken down in this way? And that's because as the People will concede, for the first rape there is no proof that he intended to commit the rape at the time he pushed her into the truck. . . . [¶] But for the second rape . . . [after appellant] drops [Moreno] off, and you remember he says, I'm going to take you home now. Believing him, [Doe] crouches down in the back seat, and it's only until a little later that she looks up and realizes she's not going to her house. . . . [¶] For that portion you can reasonably conclude that his intent was to commit a second rape."

People correctly acknowledge, Doe returned to the truck because she was more afraid of being left after dark in a remote location with no lights, houses, or cars nearby, than she was of being in the truck with Moreno and appellant. Under these circumstances, Doe's return to the truck cannot be characterized as voluntary, signaling her detention had ended. (See *People v. Power* (2008) 159 Cal.App.4th 126, 137 [characterization of victim's movement, resulting from "fear induced by the [defendant's] threats" of physical harm to her family, as "not compelled because she could have gone to the police or simply refused to comply . . . is like saying that pointing a gun at a victim's head does not constitute force or fear because the victim could refuse to comply or could call for help— and be shot"]; *People v. La Salle* (1980) 103 Cal.App.3d 139, 146 [jury could conclude victim's entry into defendant's car was compelled by force where defendant lured victim's two-year-old daughter into his car and told the victim " '[i]f you want her, you have to get in the car with me' "], disapproved of on another ground by *People v. Kimble* (1988) 44 Cal.3d 480, 496 & fn. 12.)

The detention also did not end at Moreno's house in Palo Alto. The People assert that, after Moreno got out of the truck, Doe "climbed in the front seat, reportedly unafraid." To the contrary, Doe testified she remained in the back seat with her head down and was "really afraid" and "traumatized." Doe testified she did not try to leave the truck in part because of this fear and in part because she believed appellant would take her home. Doe did not testify she believed she was free to leave the truck, and there is no evidence appellant told her she was free to leave or offered her the keys so she could drive. Under these circumstances, the fact that Doe remained in the truck is not evidence her detention had ended.

As the evidence shows "a single abduction, followed by a continuous period of detention," no substantial evidence supports the second kidnapping conviction. (*People v. Thomas, supra,* 26 Cal.App.4th at p. 1335.)

## DISPOSITION

The judgment as to count 2 is reversed. The trial court is directed to enter a dismissal as to count 2, and to prepare and forward to the Department of Corrections and

8

Rehabilitation an amended abstract of judgment.  In all other respects, the judgment is affirmed.

_____

SIMONS, J.

We concur.

_____

JONES, P.J.

_____

BRUINIERS, J.